No. 24-10748

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

BLAKE WARNER,
*Plaintiff-Appellant,*

v.

HILLSBOROUGH COUNTY CLERK OF COURTS
*Defendant-Appellee.*

◆

On Appeal from the United States District Court
for the Middle District of Florida
(8:22-cv-01977-MSS-SPF)

## BRIEF OF APPELLANT

Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002-4995
Tel: 713.229.1234
Fax: 713.229.1522
aaron.streett@bakerbotts.com

Megan E. Tankel
**BAKER BOTTS L.L.P.**
700 K Street, N.W.
Washington, DC 20001-5692
Tel: 202.639.7700
Fax: 202.639.7890
megan.tankel@bakerbotts.com

Matthew P. Erickson
Matthew M. Hilderbrand
**BAKER BOTTS L.L.P.**
401 South 1st Street, Suite 1300
Austin, Texas 78704-1296
Tel: 512.322.2500
Fax: 512.322.2501
matthew.erickson@bakerbotts.com
matthew.hilderbrand@bakerbotts.com

*Attorneys for Plaintiff-Appellant Blake Warner*

No. 24-10748-B

*Warner v. Hillsborough County Clerk of Courts*

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.   **AKERMAN LLP** (Attorneys for Appellee)

2.   **BAKER BOTTS LLP** (Attorneys for Appellant)

3.   **BRATHWAITE LAW, PLLC** (Attorneys for Appellee)

4.   **BRATHWAITE, PATRICK SHERMAN** (Attorney for Appellee)

5.   **ERICKSON, Matthew P.** (Attorney for Appellant)

6.   **FIORE, Kristen M.** (Attorney for Appellee)

7.   **HILDERBRAND, Matthew M.** (Attorney for Appellant)

8.   **HILLSBOROUGH COUNTY CLERK OF COURTS** (Appellee)

9.   **MORAN, Gregg** (Attorney for Appellee)

10.   **SCRIVEN, MARY S., U.S. DIST. JUDGE** (M.D. Fla.)

11.   **STREETT, Aaron M.** (Attorney for Appellant)

i

12. **TANKEL, Megan** (Attorney for Appellant)

13. **WALK, Rochelle** (Mediator)

14. **WARNER, Blake** (Appellant)

The undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument because this case involves important constitutional questions of first impression regarding the level of constitutional protections afforded to citizens before the government may escheat private property. *First*, in the age of telephones, texts, email, and electronic filing, does a statute requiring only publication in a local newspaper (here, one that is mostly in a language other than English) pass the minimum requirements of due process? *Second*, does sending an official notice to an address that has received 13 return-to-sender notices, coupled with listing in a Spanish-language paper periodical, satisfy the minimum notice requirements before taking a private citizen's property? *Third*, can the government take private property by claiming it has been "abandoned" after only 15 months, when the constitutional benchmark closer to 20 years? Appellant believes that oral argument would assist the panel in weighing the important legal issues presented in this case.

## TABLE OF CONTENTS

Certificate Of Interested Persons And Corporate Disclosure Statement........ i

Statement Regarding Oral Argument .................................................................iii

Table of Citations ............................................................................................ vi

Jurisdictional Statement ....................................................................................1

Statement of the Issues .....................................................................................1

I.      Florida's Statutory Escheatment Scheme ............................................2

II.     The Eviction Case ................................................................................6

III.    The Escheatment ..................................................................................8

IV.     The Current Case ...............................................................................11

Summary of the Argument................................................................................12

Standard of Review ..........................................................................................17

Argument ..........................................................................................................17

I.      Section 116.21 is facially unconstitutional under *Mullane* because it requires no more notice than publication in a foreign-language periodical. ...........................................................................................18

II.     The Clerk violated Warner's Due Process rights because she knew Warner no longer resided at the Fremont Address and thus would not receive the escheatment notice. ..................................................22

   A.     Warner had a property interest in the funds...................................23

B.    The Clerk's notice attempts were not reasonably calculated to reach Warner............................................................................25

   1.    The undelivered letter was not reasonably calculated to reach Warner. ...........................................................................25

   2.    Publication in a Spanish language periodical was not reasonably calculated to reach Warner, an English speaker. ...............................30

III.    The Clerk's actions constitute an unconstitutional taking. .............31

A.    The Clerk took Warner's money. .......................................................31

B.    The taking was not merely custodial.................................................32

C.    Warner did not "abandon" his money to the clerk. .........................34

Conclusion.....................................................................................................39

Certificate of Compliance ........................................................................41

Certificate of Service ...............................................................................42

v

TABLE OF CITATIONS

**Page(s)**

CASES

*Acevedo v. First Union National Bank,*
476 F.3d 861 (11th Cir. 2007) ............................................................23

*Anderson Nat'l Bank v. Luckett,*
321 U.S. 233 (1944).............................................................................35

*Arrington v. Helms,*
438 F.3d 1336 (11th Cir. 2006) ..........................................................30

*BAC Home Loans Serv'g v. Brand,*
2018 WL 5909311 (Fla. Cir. Ct. Nov. 6, 2018) .................................11

*Boddie v. Connecticut,*
401 U.S. 371 (1971)............................................................................24

*Boutique Apartments LLC v. Warner,*
Case No. 18-cc-22377 (Fla. Cir. Ct. 2018)...........................................6

*Canel v. Topinka,*
818 N.E.2d 311 (Ill. 2004).............................................................34, 38

*Cerajeski v. Zoeller,*
735 F.3d 577 (7th Cir. 2013) ..........................................14, 17, 36, 38

*Checker Cab Operators, Inc. v. Miami-Dade Cnty.,*
899 F.3d 908 (11th Cir. 2018) ............................................................33

*Christian Legal Soc'y v. Martinez,*
561 U.S. 661 (2010)............................................................................29

*Commonwealth Edison Co. v. Vega,*
174 F.3d 870 (7th Cir. 1999) ..............................................................14

*Delaware v. New York,*
507 U.S. 490 (1993)............................................................................13

*Donaldson v. Clark*,
    819 F.2d 1551 (11th Cir. 1987) (en banc) .........................................23

*Echavarria v. Pitts*,
    641 F.3d 92 (5th Cir. 2011) ...............................................................28

*Harmelin v. Michigan*,
    501 U.S. 957 (1991).............................................................................20

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015).............................................................................33

*Jones v. Flowers*,
    547 U.S. 220 (2006)..................................... 17, 26, 27, 29, 30, 31, 32

*Katsaris v. United States*,
    684 F.2d 758 (11th Cir. 1982) .....................................................35, 39

*La. Health Serv. & Indem. Co. v. Tarver*,
    635 So. 2d 1090 (La. 1994) ...............................................................34

*Marathon Petrol. Corp. v. Sec. of Fin. for Del.*,
    876 F.3d 481 (3d Cir. 2017) ...............................................................14

*Maron v. Patronis*,
    No. 4:22-cv-00255-RH-MAF, Doc. 27 (N.D. Fla. Sept. 5, 2023) ......3

*McDonald v. Mabee*,
    243 U.S. 90 (1971)...............................................................................32

*Mennonite Bd. of Missions v. Adams*,
    462 U.S. 791 (1983)........................................................................27, 29

*Milliken v. Meyer*,
    311 U.S. 457 (1940).............................................................................19

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)......................... 16, 17, 19, 20, 21, 22, 30, 31, 32

*New England Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co.*,
    495 F. Supp. 73 (S.D.N.Y. 1980) .......................................................30

*Nunley v. Dep't of Just.*,
425 F.3d 1132 (8th Cir. 2005) ........................................................... 30

*Phipps v. Watson*,
147 So. 234 (Fla. 1933) ...................................................................... 24

*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017) .............................................................. 14

*Plemons v. Gale*,
396 F.3d 569 (6th Cir. 2005) ............................................................. 28

*Provident Inst. v. Malone*,
221 U.S. 660 (1911) ........................................................................... 35

*Robinson v. Hanrahan*,
409 U.S. 38 (1972) ............................................................................. 31

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................................................... 24

*Schroeder v. City of New York*,
371 U.S. 208 (1962) ........................................................................... 29

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ....................................................................... 28

*State v. Green*,
456 So. 2d 1309 (Fla. 3d Dist. Ct. App. 1984) .............................. 2, 14

*Taylor v. Yee*,
136 S. Ct. 929 (2016) (Alito, J., concurring in the denial of certiorari). 14, 15, 20

*Texaco, Inc. v. Short*,
454 U.S. 516 (1982) .............................................. 13, 36, 37, 38, 39

*Tyler v. Hennepin Cnty., Minn.*,
598 U.S. 631 (2023) ........................................................................... 35

*United States Trust Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) ............................................................................... 19

viii

*United States v. Sec. Indus. Bank*,
  459 U.S. 70 (1982) ........................................................................18

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) ......................................................................19

*Walker v. Hutchinson*,
  352 U.S. 112 (1956) ......................................................................29

*\*Webb's Fabulous Pharms., Inc. v. Beckwith*,
  449 U.S. 155 (1980) ....................................................24, 25, 32, 33, 38

*Yarbrough v. Decatur Hous. Auth.*,
  941 F.3d 1022 (11th Cir. 2019) ...................................................18

**STATUTES**

Fla. Stat. § 50.011 ..............................................................5, 6, 16, 22

Fla. Stat. §§ 50.011, 50.031 (effective June 29, 1999 to Dec. 31, 2021) .................6

Fla. Stat. § 83.60 ....................................................................................7

*Fla. Stat. § 116.21 ......................................................................4, 16, 39

Fla. Stat. §§ 717.001, *et. seq.* ....................................................2, 34

Fla. Stat. §§ 717.113 ..............................................................................4

Fla. Stat. §§ 717.123 ..............................................................................4

Fla. Stat. § 717.118 ................................................................................3

Fla. Stat. § 717.124 ................................................................................3

**OTHER AUTHORITIES**

Sue Carlton, *For 100 Years Now, You Simply Had to Read Tampa's La Gaceta Newspaper,* Tampa Bay Times (Mar. 9, 2022) ................................10

*Unclaimed Property, 50 State Statutory Surveys: Financial Services: Bank Operations*, Thomson Reuters (Oct. 2022) ......................................13

ix

## Jurisdictional Statement

The district court had federal question jurisdiction under 28 U.S.C. § 1331, and this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

I.  Whether the district court erred in granting summary judgment to Defendant on Warner's facial Due Process challenge to Fla. Stat. § 116.21, which allows for escheatment notice in a non-English printed periodical.

II.  Whether the district court erred in granting summary judgment to the Clerk on Warner's as-applied Due Process challenge to the Clerk's taking of Warner's money in a court registry when the only attempts at notifying Warner were (1) a letter sent to an address the Clerk had reason to know was no longer in-use and (2) publication in an obscure, predominantly Spanish-language newspaper.

III.  Whether the district court erred in granting summary judgment to the Clerk on Warner's Takings Clause claim on the ground that Warner had "abandoned" his property after only 15 months.

STATEMENT OF THE CASE

Plaintiff-Appellant Blake Warner ("Warner") brought this § 1983 action against the Hillsborough County Clerk of Courts ("Clerk" or "Defendant") for escheating his funds from the court registry and depositing them in a county fund. The district court denied Warner's Motion for Partial Summary Judgment and granted Defendant's Motion for Summary Judgment on all claims. Doc. 50.

## I.     Florida's Statutory Escheatment Scheme

Before turning to the facts giving rise to this action, it is necessary to understand the background legal framework for escheatment in Florida. This case involves the interplay of three Florida statutes.

First, Florida's Unclaimed Property law governs the disposition of the vast majority of unclaimed property in Florida. Fla. Stat. §§ 717.001, *et. seq.* The objectives of the statute are "to protect the interests of owners . . . and to give the [] state the use of some considerable sums of money . . ." *State v. Green*, 456 So. 2d 1309, 1312 (Fla. 3d Dist. Ct. App. 1984) (quoting Uniform Disposition of Unclaimed Property Act (1954), Prefatory Note, 8A U.L.A.

215-17 (1983)). It allows for *custodial* escheatment (that detail is important) of various types of property deemed unclaimed and sets up a comprehensive scheme to notify owners[3] and a process by which owners can make claims on their property in perpetuity. Fla. Stat. § 717.124.[4] Upon receipt, "the state assumes custody and responsibility for the safekeeping of the property." *Id*. § 717.1201. Funds are deposited in the Unclaimed Property Trust Fund, which is used to pay claims, administer the statute, and pay for state schools. *Id*. § 717.123.

Section 717.113 of Florida's Unclaimed Property Act governs property held by courts and public agencies. It states that intangible property held by a court that has not been claimed for one year after it "became payable or distributable" is "presumed unclaimed," and can be deposited into the state

_____

[3] "[T]he department shall use cost-effective means to make at least one active attempt to notify owners of unclaimed property accounts valued at more than $250 with a reported address or taxpayer identification number." Fla. Stat. § 717.118(i).

[4] Order of Dismissal, *Maron v. Patronis*, No. 4:22-cv-00255-RH-MAF, Doc. 27, at *1 (N.D. Fla. Sept. 5, 2023) ("Florida set no deadline for an owner to reclaim property.").

Unclaimed Property Trust Fund. Fla. Stat. §§ 717.113, 717.123. Notably, this provision does not apply to money in the court registry for which no court order has been issued to determine an owner. Such funds "[do] not become payable or distributable and [are] not subject to reporting under this chapter." *Id*. § 717.113.

Second, funds "collected or deposited" by a county sheriff or clerk of courts that are not governed by Florida's Unclaimed Property Law fall under Fla. Stat. § 116.21.[5] Under this provision, the county clerk is authorized at her discretion to pay into a county fine and forfeiture fund "unclaimed moneys deposited or collected by [the clerk] in [her] official capacity" after as little as 18 months.[6] Unlike the state Unclaimed Property law, the only notification

---

[5] The Florida Office of Attorney General explained that Fla. Stat. § 116.21 "governs the disposition of all other funds the Clerk or the sheriff has collected or deposited in his or her official capacity that remain unclaimed and are not specifically directed to be disposed of otherwise by law." Fla. Att'y Gen. Op., Re: Clerk Of Court—Unclaimed Property—disposition of unclaimed funds in court registry (Oct. 27, 1999) No. 99-64.

[6] Fla. Stat. § 116.21(1). Specifically, the provision allows the sheriffs and clerks of the various courts during the month of July of every year to compile a list of all unclaimed property which came into their hands prior to January

requirement is publication "in a newspaper of general circulation" of a list of unclaimed money amounts and the "name[s] of the defendant[s]." *Id*. § 116.21(1). After publication, the owner has as little as 30 days to make a claim on his money before it is "declared forfeited to [the] county."[7]

Finally, Section 50.011 governs the requirements for notification by publication in Florida. Fla. Stat. § 50.011. At the time of the events of this case, the statute stated that when a statute directs or permits publication of notice in a newspaper "in lieu of process," the newspaper must be published at least once a week, contain at least 25 percent of its words in English, hold a periodical permit from the post office within the relevant county, contain

---

1 of the preceding year and for which a claim has not been made. If, after publishing the list in a "newspaper of general circulation," the property remains unclaimed as of September 1, it is "declared forfeited to such county." *Id* ¶ 2. The 18-month dormancy period is the period from January of the preceding year to September 1 of the following year.

[7] "Such list or compilation shall be published one time during the month of July in a newspaper of general circulation in the county served by such sheriff or clerk, and the notice shall specify that unless such moneys are claimed on or before September 1 after such publication that same shall be declared forfeited to such county." *Id*. § 116.21(2).

information of a public character or interest to the county residents, and have been in existence for at least one year prior to publishing legal notices. Fla. Stat. §§ 50.011, 50.031 (effective June 29, 1999 to Dec. 31, 2021).[1]

We turn now to the facts giving rise to the escheatment.

## II.    The Eviction Case

In 2018, Warner was a defendant in an eviction action in Hillsborough County Court, *Boutique Apartments LLC v. Warner*, Case No. 18-cc-22377 (Eviction Case). Doc. 36 at 2. As required for defendants contesting eviction actions, Warner made two deposits of disputed rent totaling $3,600.00 into the court registry.[2] Fla. Stat. § 83.60(2); Doc. 36 at 2.

Initially, Warner's address was listed on his filings in that case as 3012 W. De Leon St., Apt. 23, Tampa, Florida 33609—the property at issue in the

---

[1] In 2022, the statute was updated to include additional requirements including that the publication must have "an audience consisting of at least 10 percent of the households in the county or municipality." Fla. Stat. Ann. § 50.011 (effective Jan. 1, 2022).

[2] Warner chose to pay an additional $101 per month into the registry than what was required. Doc. 36 at 2.

Eviction Case. Doc. 36 at 3. But he moved and filed a change of address notification in June 2018, updating his address to 502 S. Fremont Ave. #1322, Tampa, Florida 33606 (the "Fremont address"). *Id.*

On June 23, 2018, Warner abandoned the apartment that was the subject of the Eviction Case. *Id.* The plaintiff-landlord moved to have the registry funds released. *Id.* On October 9, 2018 the court held a hearing on the landlord's motion to disburse the funds and motions to dismiss. *Id.* At the hearing, the court ordered the landlord to submit a proposed order to disburse the funds to the landlord. *Id.* at 3-4.

After the hearing, Warner and the landlord entered into an oral agreement that Warner would drop his counterclaims against the landlord in exchange for the registry funds. *Id.* at 4. Because the funds were Warner's, the landlord did not submit a proposed order to disburse the funds and, as a result, the court never issued an order to disburse. *See id.*

A few months later, Warner moved to 3002 W. Cleveland St. #C8 in Tampa. Doc. 33 at 4. While Warner did not file an additional change of address form in the case following his move, he did maintain an e-file

account on myfloridaaccess.com associated with the Eviction Case. Doc. 36 at 5. This e-file account included an up-to-date email address, phone number, and an address where Warner has consistently received mail since 2006—his mother's address at 6220 S. Kelly Road Tampa, Fl. 33611 (the "Kelly Road address"). *Id.* The Kelly Road address is also the address associated with Warner's driver's license. Doc. 33 at 8.

Between February 24, 2020 and June 15, 2020, after Warner's moved to 3002 W. Cleveland St., the court received *thirteen* returned mail notices for Eviction Case notices that were mailed to Warner's 502 S. Fremont Ave address. Doc. 36 at 4.

On June 12, 2020, the court dismissed the Eviction Case for lack of prosecution. *Id.* Warner left his money temporarily in the court registry, believing it would be safe. *See id.* at 5.

### III.    The Escheatment

On February 18, 2021, only eight months after dismissal of the case, the Clerk mailed letters to the landlord entities and Warner, notifying them of the funds remaining in the court registry and threatening escheatment of

those funds pursuant to the Florida Unclaimed Property Act—not the county fine-and-forfeiture law—if the parties did not claim them by April 21, 2021. Doc. 36, Ex. D.

The Clerk mailed Warner's letter to the Fremont Ave. address despite the 13 prior returned mail notices from that address. Doc. 36 at 4. The Clerk did not serve Warner on his e-file account, contact him at his readily available email or phone number, or run any sort of search for Warner's current address. Doc. 33 at 5.

On July 9, 2021, after receiving no response from Warner to the letter sent to the Fremont Ave address, the Clerk published a list of unclaimed funds in a newspaper called *La Gaceta*. *Id.* at 5. This publication included the following entry: "BOUTIQUE APARTMENTS LLC, BROOKLYN FLATS VS WARNER, BLAKE 18-CC022377 05/24/2018 *717.113 $3,600." *Id.*

*La Gaceta* is a weekly Tampa-area newspaper that is published and targeted at Latinos. Doc. 33 at 6.[3] Approximately 60 to 80 percent of the

---

[3] *La Gaceta* started as a Spanish-language daily newspaper but added an English section in the 1950s so that it could publish legal advertisements

newspaper consists of advertising—on the day that Defendant published Warner's unclaimed property notification, more than 70 percent of the newspaper was legal advertisements. Doc. 33 at 6; *La Gaceta* (Jul. 9, 2021). *La Gaceta* is not widely circulated in Hillsborough County. In July 2021, the newspaper reached between 0.14 and 0.20 percent of residents in Hillsborough County, Florida. Doc. 33 at 6.[4]

Warner is a non-Hispanic, African-American male who cannot read or understand Spanish and does not subscribe to *La Gaceta*. Doc. 38, Ex. 3.

On September 1, 2021, the Clerk deposited Warner's registry funds into the county fine and forfeiture fund for public use. Doc. 36 at 5.

And, apparently just realizing that notice could be posted electronically, the Clerk posted a message on the docket in the Eviction Case, this time citing Fla. Stat. § 116.21—not the Unclaimed Property Act as she

---

pursuant to Florida law. Sue Carlton, *For 100 Years Now, You Simply Had to Read Tampa's La Gaceta Newspaper*, Tampa Bay Times (Mar. 9, 2022). It has since added an Italian section as well, making it a trilingual publication. *Id*.

[4] For more on La Gaceta circulation, see Order, *BAC Home Loans Serv'g v. Brand*, 2018 WL 5909311 (Fl. Cir. Ct. Nov. 6, 2018).

mentioned in the letter—as the statutory authority: "UNCLAIMED FUNDS DISPOSED PER FS 116.21, FUNDS FOREVER BARRED." Doc. 33 at 5. Inexplicably, Defendant chose not to check the box to serve this message to Warner's e-file account. Doc. 33 at 5.

## IV.    The Current Case

Warner sought to reclaim the funds sometime in 2022, only to learn that they had been escheated. On August 29, 2022, Warner initiated this pro se § 1983 action against the Hillsborough County Clerk of Courts. In his complaint, Warner alleged that Defendant seized his property in violation of Florida statutes, the Due Process Clause of the Fourteenth Amendment, and the Takings Clause. Doc. 1. Additionally, he brought facial Due Process challenges against Fla. Stat. §§ 116.21 and 50.031 and asserted state-law claims of defamation and breach of fiduciary duty. *Id.* Finally, he asserted a First Amendment retaliation claim. *Id.* On June 10, 2023, Warner moved for partial summary judgment, Doc. 33, and on June 30, 2023, Defendant moved for summary judgment on all claims, Doc. 37.

On February 12, 2024, the court granted summary judgment to Defendant. Doc. 50 at 1. The court declined to rule on whether the mailed notice to Warner's outdated address satisfied the requirements of due process, instead ruling that publication in *La Gaceta* was constitutionally sufficient notice. *Id.* at 9-10. The court also held that Defendant did not violate the Takings Clause because Warner had abandoned his funds. *Id.* at 12 (citing *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982)).[5]

Warner appealed.

## SUMMARY OF THE ARGUMENT

Today, every state and the District of Columbia has an escheatment scheme under which the government has the power to take custody or title of property it deems unclaimed or abandoned. *Unclaimed Property, 50 State Statutory Surveys: Financial Services: Bank Operations*, Thomson Reuters (Oct. 2022). Descended from an English common law doctrine under which the

_____

[5] Additionally, the court granted summary judgment on Warner's fiduciary duty, defamation, and First Amendment claims. Warner does not pursue these claims on appeal.

unowned property of subjects who died intestate would escheat to the crown, escheatment has historically aimed to put unclaimed, unproductive property to productive use[6] or, in more modern times, to safekeep property until it can be reunited with its owner. *Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 872 (7th Cir. 1999); *State v. Green*, 456 So. 2d 1309, 1312 (Fla. 3d Dist. Ct. App. 1984).

Unfortunately, as states have realized the lucrative nature of these laws, some have strayed further and further from these noble aims toward the singular objective of raising cash for state and local governments.[7]

---

[6] *Delaware v. New York*, 507 U.S. 490, 497 (1993) ("States as sovereigns may take custody of or assume title to abandoned personal property as *bona vacantia*, a process commonly (though somewhat erroneously) called escheat."); *Cerajeski v. Zoeller*, 735 F.3d 577, 579 (7th Cir. 2013) ("With no owner (abandoned property), or no known owner (lost or mislaid or forgotten property), a property is unlikely to be put to its most productive use.").

[7] *Marathon Petrol. Corp. v. Sec. of Fin. for Del.*, 876 F.3d 481, 488 (3d Cir. 2017) ("'[I]n recent years, state escheat laws have come under assault for being exploited to raise revenue rather than' to safeguard abandoned property for the benefit of its owners." (citing *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017))).

Escheatment schemes have expanded, procedures to notify owners have contracted, and the amount of time property must sit dormant before it is deemed "unclaimed" have been steadily reduced. *See Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., concurring in the denial of certiorari).

These trends raise serious constitutional concerns. Justices Alito and Thomas recently admonished: "As advances in technology make it easier and easier to identify and locate property owners, many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property." *Id*.

This case is an extreme example of that trend. Using a statute that has dubious applicability, the Hillsborough County Clerk of Courts escheated Warner's funds from a court registry after less than 15 months of inactivity,[8] notifying him only by (1) mailing a letter to an address at which the clerk already knew Warner no longer received mail (as evidenced by the 13 return-to-sender notices from that address); and (2) publishing a notice in

---

[8] Inactivity is the time following the dismissal of the Eviction Case to the date of escheatment. (June 12, 2020 to September 1, 2021).

small print inside a predominantly Spanish-language paper periodical with a very limited reach in the county. The Clerk's actions were unconstitutional.

First, the Florida statute relied upon facially violates the Due Process Clause. The statute *solely* requires notice by publication. Fla. Stat. § 116.21. Considered in conjunction with a different Florida statute, Fla. Stat. § 50.011, which allows notification by publication in predominantly non-English language publications, the result is astounding: Florida's escheatment scheme allows owners to be "notified" in a newspaper or periodical published in a language they do not even speak.

When property interests are at stake, notice must be "reasonably calculated . . . to apprise interested parties" of the potential deprivation. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Publication notice is adequate only where it is not reasonably possible to give more adequate warning. *Id*. at 317. In *Mullane*, the Court held that publication alone does not comport with Due Process when the governmental actor knows the place of residence of those to whom notice is being provided. By

requiring only publication notice before property is escheated, Section 116.21 is insufficient on its face.

Second, on the as-applied challenge, the Clerk's actions violated Warner's Due Process rights. The Clerk's letter notice was nothing more than a "mere gesture" under these circumstances. *Id*. at 315. The Clerk knew that Warner was not residing at the Fremont address because of the 13 return-to-sender notices and was thus required to take "reasonable steps to attempt to provide notice to the property owner." *Jones v. Flowers*, 547 U.S. 220, 225 (2006). The Clerk did not take any reasonable steps, even though she had Warner's email address, phone number, e-filing information, and access to other addresses at which he could receive mail.

Third, the Clerk's actions violated the Takings Clause. Courts have typically approved escheatment schemes under the Takings Clause under two circumstances: 1) schemes involving custodial escheatment in which owners can make claims on their property in perpetuity or 2) absolute

escheatment schemes with clear abandonment.[9] Here, the Clerk took title, not custody of Warner's funds. Thus, absent proper abandonment, the Clerk's confiscation under the guise of "escheat" was nothing more than "a classical 'taking,'" in which "the Government acquire[s] for itself the property in question." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 77 (1982). Florida's brief dormancy period is insufficient to withstand constitutional scrutiny because it is far shorter than what courts have approved in the past.

## STANDARD OF REVIEW

This Court reviews summary judgment de novo, "applying the same legal standards used by the district court." *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019).

## ARGUMENT

The Florida scheme and the Clerk's actions are unconstitutional for three reasons. First, Section 116.21 is facially unconstitutional under the Due Process Clause because it solely requires notice by publication. Second,

---

[9] *Cerajeski*, 735 F.3d at 579 (discussing the two approaches to escheatment laws).

notwithstanding the statute, the Clerk violated Warner's Due Process rights by providing insufficient notice of the escheatment. Third, the Clerk's actions constitute an unconstitutional taking because Warner did not abandon the funds.

## I. Section 116.21 is facially unconstitutional under *Mullane* because it requires no more notice than publication in a foreign-language periodical.

"An elementary and fundamental" requirement of due process is proper notice. *Mullane*, 339 U.S. at 314. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id*. (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The government cannot make "mere gesture[s]," but must employ means "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id*. at 315.

When the government's own fiscal self-interest is involved, the requirements of due process are heightened. The Supreme Court has long expressed constitutional "concern with governmental self-interest" when

"the State's self-interest is at stake." *United States v. Winstar Corp.*, 518 U.S. 839, 897 n.41 (1996) (quoting *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26 (1977)). As Justice Scalia put it, "it makes sense to scrutinize governmental action more closely when the State stands to benefit." *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991).

Section 116.21 fails this test.[10] It requires only notification via the "decidedly old-fashioned method[]" of "blanket newspaper notification" as

---

[10] At various points, the Clerk cited different escheatment laws as statutory authority based on which best suited the goal of expeditiously transferring Warner's money into the county fund. When she wished to initiate escheatment procedures only eight months after the *Boutique Litigation* case was dismissed, she cited Florida's Unclaimed Property Act Fla. Stat. § 717.13, which has a shorter dormancy period (one year) than Fla. Stat. § 116.21 (eighteen months). When she wished to deposit Warner's funds into the county fund rather than the state fund and to bar Warner forever from making a claim on them, she instead invoked Fla. Stat. § 116.21.

The Florida scheme is admittedly opaque. Questions remain regarding when Section 717.13 applies and when Section 116.21 applies. However, the district court held and Defendant has maintained that Section 116.21 applies in this case. Thus, Warner launches a facial attack on Section 116.21 as interpreted by the district court and Defendant.

a first and only resort. *Yee,* 136 S. Ct. at 930 (Alito, J., concurring in the denial of certiorari).

In *Mullane*, however, the Court held that a statute with a similarly threadbare notice-by-publication requirement was unconstitutional. 339 U.S. at 318-19. The New York banking law at issue in *Mullane* allowed trust companies to pool small trust estates together, while only requiring notice to beneficiaries through publication in a local newspaper.[11] The Supreme Court concluded that the statute's notification requirement was a mere "feint" because "[c]hance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper." *Id*. at 315. Notice solely through publication was thus not "reasonably calculated to reach interested parties" when other contact information is known or ascertainable with "due diligence." 339 U.S. at 317-18. The Court explained that resorting to publication is adequate *only* where

---

[11] *Mullane*, 339 US at 310 ("Thus the only notice required, and the only one given, was by newspaper publication setting forth merely the name and address of the trust company, the name and the date of establishment of the common trust fund, and a list of all participating estates, trusts or funds.").

it is not reasonably possible to give more adequate warning. *Id*. at 317. And because trust companies often included the names and addresses of the beneficiaries on their books, the Court found "no tenable ground for dispensing with a serious effort to inform [beneficiaries] personally." *Id*. at 318. Because the New York banking law contained no such requirement, the Court concluded that the statute was "incompatible with the requirements of the Fourteenth Amendment." *Id*. at 320.

Section 116.21 is even more egregious than the banking law in *Mullane*. The New York banking law required the court to actually *designate* a newspaper for publication, whereas Section 116.21 allows the Florida county clerk—the very party who stands to gain from the escheatment—to choose *any* publication so long as it meets the scanty requirements of Fla. Stat. § 50.011. And under Fla. Stat. § 50.011, the Clerk can choose—and *did* choose—a newspaper that is not even for English speakers!

The district court failed to grasp and assess Warner's facial challenge to Section 116.21. Instead of analyzing the statute independently as called for under a facial challenge, it held that publication in *La Gaceta* was

21

constitutionally sufficient *as-applied* because it was not possible, the court assumed, to give more adequate warning in these particular circumstances. The court did not consider the fact that Section 116.21 simply has no requirement to try any other methods of notification before resorting to publication.[12] The fact that the Clerk sent a letter to Warner (that she knew he would not receive) *might* be relevant to an as-applied challenge, but it is not germane to this facial challenge.

Section 116.21 lacks the constitutional guardrails required of escheatment laws. The district court's judgment should be reversed.

## II.    The Clerk violated Warner's Due Process rights because she knew Warner no longer resided at the Fremont Address and thus would not receive the escheatment notice.

Warner also should have prevailed below on his as-applied challenge. "Procedural due process requires notice and an opportunity to be heard

---

[12] This fact also distinguishes this statute from the statute upheld in *Acevedo v. First Union National Bank*, 476 F.3d 861, 866 (11th Cir. 2007). The statute at issue in *Acevedo* required notification to the debtor's last known address. *Id*. "By its plain terms, § 1822(e) required notice by mail only to the extent that a depositor's last known address appears in the records of the depository institution in default." *Id*. Section 116.21 requires only publication.

before any governmental deprivation of a property interest." *Donaldson v. Clark*, 819 F.2d 1551, 1558 (11th Cir. 1987) (en banc) (citing *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)).

### A.    Warner had a property interest in the funds.

To establish a procedural due process claim, a plaintiff must first show deprivation of a liberty or property interest protected by the Due Process Clause. Property interests "are not created by the Constitution" but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (citation omitted).

Florida law establishes that money deposited in a court registry is private property: "The principal sum deposited in the registry of the court plainly was private property, and . . . not the property of [the c]ounty. This is the rule in Florida." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980) (citing *Phipps v. Watson*, 147 So. 234, 235 (Fla. 1933)). Under this binding precedent, the deposited funds were private property. *Id.*

Specifically, they were *Warner's* private property. Before the state court entered judgment, Warner and his landlord entered into a settlement agreement, under which Warner was entitled to receive the full amount of his deposit in the court's registry in exchange for dropping his counterclaims. Additionally, Warner *overpaid* into the court registry. The Eviction Case judge ordered him to pay $1,699 per month, but Warner paid $1,800 per month, resulting in an overpayment of $202 ($101 each month) that indisputably belongs to Warner. Doc. 36 at 2.

But even ignoring Warner's settlement with his landlord, he still had a protected property interest in the funds. The Clerk held the funds in the court's registry "for the purpose of making a fair distribution between" Warner and his landlord. *Beckwith*, 449 U.S. at 161. "Eventually . . . that fund, less proper charges authorized by the court, would be distributed between" Warner and his landlord. *Id.* Thus, Warner "had a state-created property right to [his] respective portion[] of the fund." *Id.*

**B.    The Clerk's notice attempts were not reasonably calculated to reach Warner.**

Neither the Clerk's letter nor the *La Gaceta* notice were constitutionally adequate because they were not reasonably calculated to apprise Warner of the escheatment.

**1.    The undelivered letter was not reasonably calculated to reach Warner.**

First, the letter. In *Jones v. Flowers*, the Supreme Court held "when mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." 547 U.S. 220, 225 (2006). The Court likened the government doing nothing in the face of a return-to-sender notice to watching a postal worker accidentally drop the letters down a storm drain and taking no further actions to deliver the letters. *Id*. at 229.

*Jones* is squarely on point, except the facts here are even worse. At least in *Jones*, the Clerk did not know that the mailed notice would be returned when it was sent. Here, the Clerk did—or at least the Clerk should have known given that the last 13 mailed notices had all been returned to the

25

sender. Doc. 36 at 4. Moreover, the Clerk could have posted notice on the electronic docket in Warner's Eviction Case—in fact she did, once the funds were deemed escheated, though inexplicably she did not check the box to serve Warner with the notice. Doc. 33 at 5. Thus, as in *Jones*, the Clerk took no "additional reasonable steps to attempt to provide notice to the property owner before selling his property." 547 U.S. at 225.

The Clerk had several practicable steps available at her fingertips rather than sending a fourteenth letter after 13 return-to-sender notices. Although a party required to provide notice need not "undertake extraordinary efforts to discover . . . whereabouts . . . not in the public record," *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983), she must use "reasonably diligent efforts" to discover addresses that are "reasonably ascertainable," *id.* at 800.

No "extraordinary efforts" would have been needed to notify Warner—reasonable diligence in this case would have led the Clerk to an abundance of easy, reliable, and inexpensive ways to contact him. She could have served Warner on the e-file account associated with the Eviction Case

26

or emailed or phoned him at his last known email and phone number associated with his e-file account. Doc. 33 at 7. She also could have run a search of the DMV database and utilized the address associated with Warner's driver's license. Doc. 33 at 8.

Courts in other cases have held that similar measures would meet the "reasonable steps" requirement. Some have required government actors to search public records for alternative addresses, phone numbers, or e-mails.[13] Here, of course, the Clerk would not have had to search public records, but merely the county's *own* records. The Supreme Court has also acknowledged in other contexts that a simple internet search for contact information is not a burdensome requirement in the modern age.[10]

---

[13] *See, e.g.*, *Plemons v. Gale*, 396 F.3d 569, 577 (6th Cir. 2005) (holding "examination (or re-examination) of all available public records" is a reasonable step); *Echavarria v. Pitts*, 641 F.3d 92, 95 (5th Cir. 2011) (holding government agency must review its own "readily accessible" files).

[10] *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1544 (2016) ("[A] 'people search engine' . . . conducts a computerized search in a wide variety of databases and provides information about the subject of the search."); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 691 (2010) ("[A]ny student . . . with access to

Of course, the Clerk was not required to conduct an open-ended search for a new address. *Mennonite*, 462 U.S. at 798, n.4. Nor does the Constitution require actual notice. But each of the potential actions the Clerk had available are far from burdensome or open-ended. In *Jones*, the Court rejected the suggestion that the state was required to search public records like the phone book to find his contact information. 547 U.S. at 222. Here, alternative contact information was available through the very case in which the funds were involved. Appellant's name "was known to the city and was on the official records." *Walker v. Hutchinson*, 352 U.S. 112, 116 (1956).[11]

And while email or phone may not be the traditional means of government to contact its citizens, the legal system "cannot be blind to changes and advances in technology." *New England Merchs. Nat'l Bank v. Iran*

---

Google—that is, all of them—could easily have found [a student organization].") (citation omitted).

[11] *See also Schroeder v. City of New York*, 371 U.S. 208 (1962) (holding publication in a newspaper and posted notices were inadequate to apprise a property owner of condemnation proceedings when his name and address were readily ascertainable from both deed records and tax rolls).

*Power Generation & Transmission Co.*, 495 F. Supp. 73, 81 (S.D.N.Y. 1980). "Due process is a flexible concept that varies with the particular circumstances of each case." *Arrington v. Helms*, 438 F.3d 1336, 1350 (11th Cir. 2006). This includes the technology available and widely used at the time. Government is required to reach citizens where they are. More than traditional mail, email and phone "today are recognized as [] . . . efficient and inexpensive means of communication." *Mullane*, 339 U.S. at 319. Indeed, courts have required telephonic or email notice for Due Process purposes. *Nunley v. Dep't of Just.*, 425 F.3d 1132, 1138 (8th Cir. 2005) ("[A] few phone calls or e-mails" are not "heroic effort[s].").

As the Court noted in *Jones*, the Clerk was required to consider "unique information" and the "practicalities and peculiarities" of the case in assessing what additional steps, if any, to take. Undoubtedly, one such practicality of this case is that the Clerk had at least four effective contact methods available at her fingertips. 547 U.S. at 221 (citing *Mullane*, 339 U.S. at 314-15).

2.    **Publication in a Spanish language periodical was not reasonably calculated to reach Warner, an English speaker.**

Publication in *La Gaceta* was not reasonably calculated to reach Warner either. Again, in *Mullane*, the Court "held that notice by publication is not sufficient with respect to an individual whose name and address are known or easily ascertainable." *Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972). This is doubly the case when the publication is not targeted toward a demographic of which the absentee is a part.

To the extent that Appellee argues that publication was the next "reasonable step" under *Jones* after the Clerk mailed notice, she ignores that the subsequent step must also be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Jones,* 547 U.S. at 229 (citing *Mullane*, 339 U.S. at 315). It is difficult to imagine one who wanted to reach Warner resorting to publication in *La Gaceta* rather than, say, emailing or calling him. Here, as in *Jones*, "[f]ollowing up by publication was not constitutionally adequate under the circumstances presented here

because . . . it was possible and practicable to give Jones more adequate warning." *Id*. at 237.

The court below found "that Plaintiff received notice of the funds' potential forfeiture via Defendant's publication of notice in *La Gaceta*." But it strains credulity to assume that publication in a newspaper like *La Gaceta* would be seen by Warner, an English speaker who does not read Spanish periodicals. Doc. 50 at 9. "Great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *Mullane*, 339 U.S. at 320 (citing *McDonald v. Mabee*, 243 U.S. 90, 91 (1971)).

## III.    The Clerk's actions constitute an unconstitutional taking.

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, prohibits private property from being taken for public use without just compensation. *Beckwith*, 449 U.S. at 160. The Clerk's actions here violated that fundamental constitutional protection.

### A.    The Clerk took Warner's money.

"[T]o state a Takings claim under [federal] law, a plaintiff must first demonstrate that he possesses a 'property interest' that is constitutionally protected." *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 917

31

(11th Cir. 2018) (alterations in original) (citation omitted). As discussed in Section IIA, under Florida law, the funds in the registry were Warner's private property.

The Clerk's extraction of Warner's funds and deposit of those funds into the county fine and forfeiture fund was a taking. The Clerk's action was not merely to "adjust[] the benefits and burdens of economic life to promote the common good" but was rather a "forced contribution to general governmental revenues" that "is not reasonably related to the costs of using the courts." *Beckwith*, 449 U.S. at 163 (citation omitted). This was not a routine court fee that applies to all litigants. It was a wholesale extraction and appropriation of Warner's deposited funds for use by the county, and thus a prototypical taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015).

**B.    The taking was not merely custodial.**

Courts have typically upheld escheatment laws when they fall into two categories—neither of which is present here. First, laws modeled after the uniform disposition of unclaimed property acts have withstood

constitutional scrutiny because they are *custodial* statutes.[12] Under such statutes, the state does not take title to the property, and the owner can make a claim at any time. And because at all times, the owner or apparent owner owns the money under the statutory scheme, states are given more leeway with shorter dormancy periods under custodial escheatment laws.

While Florida *does* have a custodial escheatment scheme, Fla. Stat. §§ 717.001, *et. seq*, the Clerk did not take Warner's funds pursuant to that law. Instead of depositing Warner's funds into the *state* Unclaimed Property Fund identified in that law, the Clerk deposited his money into the *county* fund. And Warner was not able to re-claim his money because his funds were "forever barred," as the message posted on the Eviction Case docket read.

---

[12] *See, e.g.*, *La. Health Serv. & Indem. Co. v. Tarver*, 635 So. 2d 1090, 1099 (La. 1994) ("The uniform disposition of unclaimed property acts have withstood constitutional scrutiny, whether complained of as a taking, as an impairment of contract, or due process, or as a violation of equal protection or unlawful searches and seizures, or the guarantee of full faith and credit."); *but see Canel v. Topinka*, 818 N.E.2d 311 (Ill. 2004).

### C.    Warner did not "abandon" his money to the clerk.

Second, the Supreme Court has recognized a state's power to take possession of abandoned property. *See Provident Inst. v. Malone*, 221 U.S. 660, 664 (1911). But states may exercise this authority only "when there is substantial ground for belief" that the property has, indeed, been "inactive so long as to be presumptively abandoned." *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 240, 241 (1944).

"Abandonment" must be consistent with "state law . . . 'traditional property law principles,' plus historical practices and th[e Supreme] Court's precedents regarding abandonment." *Tyler v. Hennepin Cnty., Minn.*, 598 U.S. 631, 638 (2023). In a case involving potentially abandoned funds in Florida, the Eleventh Circuit explained: "[t]here must be a voluntary intention to abandon, or evidence from which such intention may be presumed." *Katsaris v. United States*, 684 F.2d 758, 762 (11th Cir. 1982) (citation omitted).[13]

---

[13] Similarly, Judge Posner has explained that abandonment refers to the "voluntary relinquishment or renunciation of a property right, or an ownership vacuum resulting from the owner's death without heirs or a valid will. It means that the owner gives up all claims to the property, thus

The district court concluded that Warner abandoned his property because (1) he failed to claim the deposit "for more than 1 year after it became payable or distributable"[14] and thus the property was presumed unclaimed, and (2) he failed to file a claim within the 30-day-period between the Clerk's publication of the forfeiture notice in La Gaceta and the deadline to file a claim with the Clerk.

Relying on *Texaco, Inc. v. Short*, 454 U.S. 516 (1982), the district court ruled that the Clerk's actions were not a taking at all. In *Texaco*, the Supreme Court considered an Indiana statute that terminated severed mineral

---

pitching it back into the public domain, where it is available for reappropriation." *Cerajeski*, 735 F.3d at 581 (internal citations omitted).

[14] Notably, the district court omitted another sentence of this same statute that provides that "money held in the court registry and for which no court order has been issued to determine an owner does not become payable or distributable and is not subject to reporting under this chapter." Fla. Stat. § 717.113. It is undisputed that the court had not issued an order adjudicating rights to the funds on deposit. Thus, § 717.113's presumption was never triggered.

interests which had not been used for *20 years*. 454 U.S. at 518.[15] The Supreme Court ruled that a state could treat the mineral interest as lapsed when the property owner fails to use the interest or file the statement of claim within the 20-year period provided by the statute, demonstrating that the owner has "abandoned" the property. *Id*. at 529. Importantly, the Court noted that the state had not exercised its power in an arbitrary manner. *Id*. Because the Court concluded that the state could treat the property as abandoned and the former owner's interest as lapsed, there was no taking under the Fifth Amendment. *Id*. at 530.

Florida's escheatment scheme is distinguishable from the statute the Court considered in *Texaco*. At the outset, the one-year and 18-month periods to trigger forfeiture under Fla. Stat. §§ 717.113 and 116.21, respectively, are

_____

[15] "Use" under the statute included "actual or attempted production of [the] minerals, the payment of rents or royalties," the "payment of taxes, or the "filing [of] a statement of claim with the local record of deeds" within that 20-year period. *Texaco, Inc. v. Short* 454 U.S. 516, 519 & n.7(1982).

far afield from the 20-year time period at issue in *Texaco*.[16] As is the actual 15-month period of inactivity before the Clerk escheated Warner's funds. As the *Texaco* Court itself cautioned, "[w]e need not decide today whether the State may indulge in a similar assumption in cases in which the statutory period of nonuse is shorter than [the 20-year period] involved here." *Texaco*, 454 U.S. at 535 n.28.[17]

Here, Warner's failure to claim a deposit for 15 months plus his failure to file a claim within the 30-day window after the Clerk published the notice in a Spanish-language periodical does not constitute a "voluntary intention

---

[16] *See Cerajeski*, 735 F.3d at (holding confiscation of interest on unclaimed principal from bank account through operation of Indiana Unclaimed Property Act after *three* years was taking of part of property of account holder under Indiana law).

[17] The State cannot develop clever workarounds by defining "abandonment" in statute. "Although defined by state law, a property interest is not subject to every whim and vagary of government. As the Supreme Court explained in *Webb's Fabulous Pharmacies* 'a State, by *ipse dixit*, may not transform private property into public property without compensation.' 'In other words, at least as to confiscatory regulations (as opposed to those regulating the use of property), a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law.'" *Canel*, 818 N.E.2d at 332 (citations omitted).

to abandon, or evidence from which such intention may be presumed." *Katsaris*, 684 F.2d at 762 (citation omitted). Moreover, the district court completely failed to engage with what, exactly, constitutes abandonment and how long property must be unclaimed before it is "abandoned." The court's ruling seemingly has no limits, so long as the state exacts the property subject to an enacted statute. Indeed, under the district court's reasoning, a state could presumably implement a law with a dormancy period of 30 days and a seven-day period to file a claim—or even less.

This case is also distinguishable from *Texaco* because under Section 116.21, arbitrary application of the law is built right into the statute. *See* Fla. Stat. § 116.21(i) (authorizing "at their discretion" "sheriffs and clerks of the courts" to "pay into the fine and forfeiture fund . . . any or all unclaimed moneys deposited or collected by them in their official capacity"). By contrast, the lack of arbitrary application was one of the Supreme Court's primary rationales for upholding Indiana's scheme in *Texaco*. *See* 454 U.S. at 529.

Thus, Warner did not abandon the court registry funds, and the Clerk's actions were an unconstitutional taking.

## CONCLUSION

In sum, Warner respectfully requests that the Court reverse the judgment of the district court. He requests that the Court hold that Fla. Stat. § 116.21 is facially unconstitutional under the Due Process Clause, and that the Clerk's actions violated Warner's Due Process rights and constitute an unconstitutional taking.

Dated: May 22, 2024               Respectfully submitted,

/s/ *Matthew Erickson*

BAKER BOTTS L.L.P.

Aaron M. Streett

**BAKER BOTTS L.L.P.**

910 Louisiana Street

Houston, Texas 77002-4995

Tel: 713.229.1234

Fax: 713.229.1522

aaron.streett@bakerbotts.com

Megan E. Tankel

**BAKER BOTTS L.L.P.**

700 K Street, N.W.

Washington, DC 20001-5692

Tel: 202.639.7700

Fax: 202.639.7890

megan.tankel@bakerbotts.com

Matthew P. Erickson

Matthew M. Hilderbrand

**BAKER BOTTS L.L.P.**

401 South 1st Street, Suite 1300

Austin, Texas 78704-1296

Tel: 512.322.2500

Fax: 512.322.2501

matthew.erickson@bakerbotts.com

matthew.hilderbrand@bakerbotts.com

*Attorneys for Plaintiff-Appellant Blake Warner*

40

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the page and type-volume limitations of Fed. R. App. P. 32(a)(7), because it contains 7,465 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typespace using 14-point Palatino Linotype.


 /s/ *Matthew Erickson*
Matthew P. Erickson

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2024, I electronically filed this brief and

thereby served all counsel of record through the Court's CM/ECF system.

        */s/ Matthew Erickson*

        Matthew P. Erickson