No. 24-10748

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

BLAKE WARNER,
*Plaintiff – Appellant,*
*v.*
HILLSBOROUGH COUNTY CLERK OF COURTS,
*Defendant – Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:22-cv-01977-MSS-SPF

**BRIEF OF SHAREHOLDER SERVICES
ASSOCIATION AND SECURITIES TRANSFER
ASSOCIATION, INC. AS *AMICI CURIAE* IN SUPPORT
OF APPELLANT AND REVERSAL**

Elizabeth D. Scott
Matthew E. Myatt
Jerome Berger (*pro hac vice pending*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field St., Suite 1800
Dallas, TX  75201
(214) 969-2800
edscott@akingump.com
mmyatt@akingump.com
bergerj@akingump.com

Jennifer Borden
Borden Consulting Group, LLC
71 Commercial St., Suite 198
Boston, MA 02109
(781) 307-1300
jborden@jbordenlaw.com

Stephanie Ondrof (*pro hac vice pending*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street N.W.
Washington, DC 20006
(202) 887-4312
sondrof@akingump.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for *Amici Curiae* Shareholder Services Association and Securities Transfer Association, Inc. certifies the following:

1.     In addition to those identified in the Brief of Appellant, *Amici* disclose the following listed persons and parties that may have an interest in the outcome of this case:

a) **Akin Gump Strauss Hauer & Feld LLP**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

b) **Berger, Jerome**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

c) **Borden Consulting Group, LLC**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

d) **Borden, Jennifer**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

e) **Myatt, Matthew E.**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

f) **Ondrof, Stephanie**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

g) **Scott, Elizabeth D.**, *Counsel for Amici Shareholder Services Association and Securities Transfer Association, Inc.*

h) **Securities Transfer Association, Inc.**, *Amici Curiae*

i) **Shareholder Services Association**, *Amici Curiae*

2.    The undersigned certifies that *Amici* are not-for-profit corporations that have no parent companies, and no publicly-held corporation owns 10 percent or more of their stock.

May 29, 2024                                      /s/ *Elizabeth D. Scott*
                                                 Elizabeth D. Scott

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
      DISCLOSURE STATEMENT .................................................................i

IDENTITY AND INTEREST OF *AMICI CURIAE* ....................................1

STATEMENT OF ISSUES ...............................................................3

SUMMARY OF ARGUMENT .........................................................3

ARGUMENT .........................................................................6

    A.    The District Court Erred in Granting Summary
        Judgment Because Hillsborough County Violated the
        Due Process Clause and the Takings Clause. .........................7

        1.    Hillsborough County's Notification Procedures
              Were Grossly Inadequate and Violated Due
              Process......................................................................8

        2.    Hillsborough County's Retention and
              Appropriation of Mr. Warner's Funds Without
              Just Compensation Violated the Takings Clause.......13

        3.    There Is Legally Insufficient Evidence Mr. Warner
              Abandoned His Property According to Florida
              Law, Supreme Court Precedent, and Founding-
              Era Understandings............................................15

    B.    The District Court's Erroneous Decision Has Nationwide
        Impact Because Thousands of Shareholders, Like
        *Amici*'s Constituents, Do Not Receive Adequate Notice
        or Just Compensation When the State Takes and
        Liquidates Securities. ............................................21

CONCLUSION ..........................................................................28

iii

# TABLE OF CITATIONS

**Page(s)**

## Cases

*A.W. Fin. Servs., S.A. v. Empire Res., Inc.*,
  981 A.2d 1114 (Del. 2009)...................................................................... 24

*Anderson Nat. Bank v. Luckett*,
  321 U.S. 233 (1944)............................................................................... 17

*Azure Ltd. v. I-Flow Corp.*,
  210 P.3d 1110 (Cal. 2009) ..................................................................... 24

*Barron v. Fid. Magellan Fund*,
  784 N.E.2d 634 (Mass. App. Ct. 2003) ................................................. 25

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v.
  McElroy*,
  367 U.S. 886 (1961) ................................................................................. 9

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021)................................................................. 10, 13, 20

*Cerajeski v. Zoeller*,
  735 F.3d 577 (7th Cir. 2013)................................................................. 19

*Culley v. Marshall*,
  144 S. Ct. 1142 (2024)..................................................... 4, 10, 19, 27

*Dep't of Fin. v. AT&T Inc.*,
  239 A.3d 541 (Del. Ch. 2020) ............................................................... 26

*Harmelin v. Michigan*,
  501 U.S. 957 (1991)............................................................................... 10

*Harris v. Verizon Commc'ns*,
  46 Cal. Rptr. 3d 185 (Cal. Ct. App. 2006).......................................... 24

*Horne v. Dep't of Ag.*,
  576 U.S. 350 (2015)......................................................................... 13, 15

*J.W. v. State,*
  95 So. 3d 372 (Fla. 3d DCA 2012).......................................16

*Jenkins v. United States,*
  71 F.4th 1367 (Fed. Cir. 2023)...........................................16

*\*Jones v. Flowers,*
  547 U.S. 220 (2006).........................................................20

*Katsaris v. U.S.,*
  684 F.2d 758 (11th Cir. 1982)............................................17

*\*Knick v. Twp. of Scott,*
  588 U.S. 180 (2019).........................................................14

*Loretto v. Teleprompter Manhattan CATV Corp.,*
  458 U.S. 419 (1982).........................................................13

*Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware,*
  876 F.3d 481 (3d Cir. 2017) ..........................................6, 26

*Moore v. Harper,*
  600 U.S. 1 (2023).............................................................18

*Morrissey v. Brewer,*
  408 U.S. 471 (1972)...........................................................9

*\*Mullane v. Central Hanover Bank & Tr. Co.,*
  339 U.S. 306 (1950).......................................................9, 11

*Plains All Am. Pipeline L.P. v. Cook,*
  866 F.3d 534 (3d Cir. 2017) ...............................................5

*Reed v. Goertz,*
  598 U.S. 230 (2023)...........................................................8

*Sea Servs. of Keys, Inc. v. Abandoned 29' Midnight Exp.*
  *Vessel,*
  16 F. Supp. 2d 1369 (S.D. Fla. 1998)................................16

*Standard Oil Co. v. New Jersey,*
  341 U.S. 428 (1951).....................................................18, 19

*State v. Schultz*,
   388 So. 2d 1326 (Fla. 4th DCA 1980) ................................................ 17

*Tahoe—Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002) ............................................................................ 13

\*Taylor v. Yee*,
   136 S. Ct. 929 (2016) ........................................................ 7, 9, 12, 23

*Taylor v. Yee*,
   780 F.3d 928 (9th Cir. 2015) ........................................................ 11, 24

\*Texaco, Inc. v. Short*,
   454 U.S. 516 (1982) ............................................................... 17, 18, 19

*Tulsa Pro. Collection Servs., Inc. v. Pope*,
   485 U.S. 478 (1988) ............................................................................ 11

*Tumey v. Ohio*,
   273 U.S. 510 (1927) ............................................................................ 26

\*Tyler v. Hennepin Cnty.*,
   598 U.S. 631 (2023) ............................................... 16, 17, 18, 19, 20

*United States v. Locke*,
   471 U.S. 84 (1985) .............................................................................. 18

*United States v. Miller*,
   317 U.S. 369 (1943) ............................................................................ 15

*Vondjidis v. Hewlett Packard Corp.*,
   85 Cal. Rptr. 3d 806 (Cal. Ct. App. 2009) ........................................ 11

*W. U. Tel. Co. v. Com. of Pa., by Gottlieb*,
   368 U.S. 71 (1961) ................................................................................ 4

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
   449 U.S. 155 (1980) ............................................................................ 19

## Statutes and Codes

17 C.F.R.
§ 240.17Ad-17 ................................................................. 2, 12

Act of May 2, 2024, ch. 140, Fla. Laws ................................... 21

Ala. Code
§ 35-12-80(a) .................................................................. 27
§ 35-12-80(b) .................................................................. 24
§ 35-12-80(c) .................................................................. 27

Del. Code Ann. tit. 12,
§ 1153 ......................................................................... 14

Fla. Stat.
§ 717.101(4) ................................................................... 26
§ 717.101(16)(a) .............................................................. 21
§ 717.122(2)(b) ........................................................... 24, 27
§ 717.122(c) ................................................................... 14
§ 717.1101 ..................................................................... 21
§ 717.1101(2) .................................................................. 22

Fed. R. App. P. 29(a) ......................................................... 1

Ga. Code Ann.
§ 44-12-217(b.1)(2) .................................................. 21, 24, 27

Ill. Comp. Stat. Ann.
1026/15-210(b) ................................................................ 22

Iowa Code
§ 556.17(5) .................................................................... 24

N.H. Rev. Stat. Ann.
§ 471-C:24(III) ................................................................ 24

Va. Code Ann.
§ 55.1-2529(C) ................................................................ 24

**Other Authorities**

T. Conrad Bower, *Inequitable Escheat?: Reflecting on Unclaimed Property Law and the Supreme Court's Interstate Escheat Framework*, 74 Ohio St. L.J. 515 (2013) .......... 4, 19

Fla. Dep't of Fin. Servs., Florida Annual Comprehensive Financial Report (2021) ......................................................... 5

Fla. Div. of Unclaimed Property, Securities Transfer Information ...................................................................... 14

Kathleen Elkins, *Warren Buffett and Jack Bogle agree on the formula for long-term success: 'Buy and hold'*, CNBC: Money (Sept. 18, 2018) ...................................................... 22

Rick Ferri, *Set it and Forget it Works*, Forbes (June 11, 2015)............. 23

Trent Gillies, *Warren Buffet: Buy, hold and don't watch too closely*, CNBC (Mar. 5, 2016)............................................... 23

Sarah O'Brien, *States have $70 Billion in unclaimed assets. How to check if any is yours*, CNBC (Feb. 1, 2023) ............................ 5

Revised Unified Unclaimed Prop. Act (Unif. L. Comm'n 2016)................................................................... 4, 23

Unified Unclaimed Prop. Act ......................................... 23, 24

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Shareholder Services Association ("SSA"), a nonprofit trade association founded in 1946, supports corporate issuers in meeting their responsibilities for shareholder communications and regulatory compliance.  Its membership includes public companies, many of which are located in Florida, Alabama, and Georgia.  The Securities Transfer Association, Inc. ("STA") is the national professional association of transfer agents.  Founded in 1911, its membership includes almost 100 transfer agents who collectively, on behalf of more than 15,000 corporate issuers, maintain the records of more than 100 million registered shareholders, many of whom are citizens of Florida, Alabama, and Georgia.

The SSA and STA provide representation and leadership on issues such as state and federal laws and regulations that affect their memberships. They provide education and training; regularly collaborate with federal regulatory agencies such as the Securities and

---

[1] *Amici* certify that no counsel for either party authored this brief in whole or in part, and that no party or other person other than *Amici* or their counsel made a monetary contribution to the brief's preparation or submission.  All parties consent to the filing of this brief.  Fed. R. App. P. 29(a).

Exchange Commission ("SEC") and custodians of securities; and provide forums allowing their members to proficiently deliver services to shareholders.

The STA's members are highly regulated by the SEC and are required to comply with 17 C.F.R. § 240.17Ad-17, the regulation that dictates the manner in which transfer agents must reach out to lost or unresponsive shareholders. This federal regulation intersects with state unclaimed property laws that prescribe the point when property is presumed abandoned and the subsequent requirement to alert shareholders of the impending transfer of their property to the states via escheatment.

The interests of the SSA and STA in this case are two-fold. First, their members must comply with the unclaimed property laws of each jurisdiction in the United States and beyond, or risk significant statutory assessments of interest and penalties. *Amici*'s members therefore frequently find themselves defending their compliance with state laws after states liquidate securities that were reported as unclaimed property and then fail to provide just compensation to shareholders. In the decision below, the court allowed notice that is inconsistent with the

SEC's regulations related to lost or unresponsive shareholders, state unclaimed property laws and federal common law, thus complicating *Amici*'s ability to comply with applicable requirements. Second, the shareholders whose interests the SSA and STA members endeavor to protect are at substantial risk of losing their property rights when states take custody of and liquidate their shares without proper notice. This in turn increases the risk that said shareholders will continue to seek recourse against *Amici*'s members for losses suffered as a result of members' compliance with unclaimed property laws.

## STATEMENT OF ISSUES

Whether the district court erred in granting summary judgment to Hillsborough County on Mr. Warner's Due Process and Takings Clause challenges where the only attempts at notifying Mr. Warner prior to the forfeiture of his property were through publication in a non-English periodical and via letter sent to an address the Clerk had reason to know was no longer in-use and where Mr. Warner's property was treated as "abandoned" after only 15 months following those attempts.

## SUMMARY OF ARGUMENT

The SSA and STA urge this Court to reverse the district court's decision denying Mr. Warner relief and to provide clear, unambiguous

standards regarding the constitutional constraints on state unclaimed property laws.

More than 60 years ago, the Supreme Court signaled that "[t]he rapidly multiplying state escheat laws . . . have presented problems of great importance[.]" *W. U. Tel. Co. v. Com. of Pa., by Gottlieb*, 368 U.S. 71, 79 (1961). Since then, unclaimed property laws have become increasingly strict and aggressively enforced. Much like in the civil forfeiture context, states have developed an "increase[ed] dependence" on unclaimed property "as a source of revenue." *Culley v. Marshall*, 144 S. Ct. 1142, 1158 (2024) (Gorsuch, J., concurring); *see* T. Conrad Bower, *Inequitable Escheat?: Reflecting on Unclaimed Property Law and the Supreme Court's Interstate Escheat Framework*, 74 Ohio St. L.J. 515, 517 (2013). Nearly a decade ago, the National Association of Unclaimed Property Administrators estimated that states collectively held "more than $40 billion in unclaimed property"—a figure that was nearly twice the $22.8 billion reported in 2003. *See* Revised Unif. Unclaimed Prop. Act, Prefatory Note at 5 (Unif. L. Comm'n 2016). That number has only

increased.[2]  Florida, for instance, holds over $3.5 billion in unclaimed property and received approximately $680 million in remittances from unclaimed property in 2021 alone.[3]

Unfortunately, this rapidly increasing reliance on unclaimed property as a critical revenue stream incentivizes states to seize private property that is erroneously deemed abandoned, and to skirt their constitutional obligations to provide adequate notice and just compensation.  That is precisely what happened here.  Hillsborough County's "notice" through a non-English periodical was not "reasonably calculated" to reach Mr. Warner, especially because the county had access to Mr. Warner's contact information in its *own records*.  Likewise, Hillsborough County violated the Takings Clause by refusing to return Mr. Warner's funds or otherwise compensate him after wrongfully deeming his property abandoned.

---

[2] Recent reports estimate that states hold $70 billion today.  *See* Sarah O'Brien, *States have $70 Billion in unclaimed assets. How to check if any is yours*, CNBC (Feb. 1, 2023), https://www.cnbc.com/2023/02/01/how-to-check-if-youre-owed-a-share-of-70-billion-in-unclaimed-assets.html.

[3] *See* Fla. Dep't of Fin. Servs., Florida Annual Comprehensive Financial Report 262 (2021); *see also, e.g.*, *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017) (noting that "unclaimed property has become Delaware's third-largest source of revenue").

This erosion of property rights violates the Due Process and Takings Clauses, contradicts Supreme Court precedent, and undermines the intent of unclaimed property statutes. If the district court's decision is allowed to stand, Florida and other states will continue to prioritize revenue over reuniting owners with their property. Securities owners, in particular, will face an increased risk of loss, as most owners decide to exercise their ownership interests by following simple and sound investment advice: do nothing.

## ARGUMENT

Escheat laws serve a valuable function when used to reunite lost owners or their heirs with property that sits unclaimed. But when property is erroneously presumed unclaimed or abandoned, escheat laws do the opposite—they *harm* property owners. In recent years, unclaimed property laws across the country have "come under assault for being exploited to raise revenue rather than to safeguard abandoned property for the benefit of its owners." *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 488 (3d Cir. 2017) (cleaned up). And rightfully so. As recently noted by Justices Alito and Thomas, states are "doing less and less to meet their constitutional obligation to" reunite

property owners with their property and are doing more and more to deem unclaimed property as "abandoned." *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., concurring). The upshot of this aggressive—and unconstitutional—approach is that plaintiffs like Mr. Warner, and shareholders like those *Amici* support, are often left without adequate due process or just compensation, all in violation of bedrock principles of the U.S. Constitution.

## A. The District Court Erred in Granting Summary Judgment Because Hillsborough County Violated the Due Process Clause and the Takings Clause.

The rulings below provide a troubling precedent for property rights in Florida. The impact is especially concerning in the context of securities. The district court held that publication of legal notice in a newspaper, *La Gaceta*, that at best reached 0.20% of residents in Hillsborough County was "constitutionally sufficient." App.151. The court did not address the other avenues through which the Clerk could have reached Mr. Warner. Nor did the court undertake an independent assessment of whether notification through *La Gaceta*—while purportedly permissible under the statute—was in fact reasonably calculated to inform Mr. Warner of his funds' potential forfeiture, as required under the Due Process Clause.

7

The district court's erroneous ruling on notice likewise informed its ruling on Mr. Warner's Takings claim. There, the court concluded that the transfer of Mr. Warner's property into the county fine and forfeiture fund did not amount to a taking. Key to the court's conclusion was the premise that the funds were "unclaimed" and "forfeit[ed]" because Mr. Warner failed to claim them within the statutorily prescribed period of 15 months. But the court overlooked that Mr. Warner failed to do so, in part, because he never received constitutionally adequate notice. Moreover, the court erred in treating the property as abandoned after a mere 15-month dormancy period following such inadequate notice.

The dangerous erosion of property rights evident through the rulings below will continue so long as states are allowed to take—and, in the context of securities, also liquidate—private property without constitutionally adequate notice or just compensation.

## 1.  Hillsborough County's Notification Procedures Were Grossly Inadequate and Violated Due Process.

The Due Process Clause protects against state action that deprives a person of his or her protected interest in life, liberty, or property without due process of law. *Reed v. Goertz*, 598 U.S. 230, 236 (2023). It is "[a]n elementary and fundamental" constitutional requirement that notice must

be "reasonably calculated, under all the circumstances," to reach the property owner. *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Notification procedures may not be "empty rituals" or "mere gestures." *Id.* at 315 ("[P]rocess which is a mere gesture is not due process."); *Taylor*, 136 S. Ct. at 929 (Alito, J., concurring) ("Because the seizure of private property is no small thing, notification procedures may not be empty rituals[.]").

The requirements of due process are also context specific. *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) ("Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.") (cleaned up). The standard is "flexible" and requires as many "procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Notably, courts "do not afford any particular solicitude to 'governmental interests' [for purposes of Due Process] . . . in cases like this one where the government seeks to deprive an individual

9

of her private property." *Culley*, 144 S. Ct. at 1153 (Gorsuch, J., concurring).[4]

Hillsborough County's retention and appropriation of Mr. Warner's funds was a deprivation of property that triggered due process protections.[5] Hillsborough County was therefore required to provide Mr. Warner with context-specific, constitutionally sufficient notice prior to its taking.

But Hillsborough County's efforts were far from "reasonably calculated" to provide Mr. Warner with adequate notice. Indeed, in the context of Mr. Warner's case, the county had alternative contact information for Mr. Warner and had even used that information to communicate with him in the past. Yet, Hillsborough County still opted to provide notice through (1) a periodical of limited circulation in a language Mr. Warner does not speak and (2) a letter sent to an address the Clerk had reason to know was no longer in-use. Such efforts amount to little more than a "gesture" and appear more calculated to *avoid* notice than to

---

[4] *See also Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) ("[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit.").

[5] *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("The government commits a physical taking when . . . [it] physically takes possession of property without acquiring title to it.").

actually reach Mr. Warner.  *See Mullane*, 339 U.S. at 315; *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485, 490–91 (1988) (due process requires "reasonably diligent efforts").  Mr. Warner's email and other contact information were reasonably available—or at least readily ascertainable—from Hillsborough County's *own records*.[6]  Given the substantial interests at stake, the availability of alternative methods of communication, and the relative ease and minimal effort it would have been to provide reasonably calculated notice, Hillsborough County should have done more.

As Justices Alito and Thomas explained:

This trend—combining shortened escheat periods with minimal notification procedures—raises important due process concerns.  As advances in technology make it easier and easier to identify and locate property owners, many States appear to be doing less and less to meet their constitutional obligation to provide adequate notice before escheating private property.  Cash-strapped States undoubtedly have a real interest in taking advantage of truly abandoned property to shore up state budgets.  But they also have an obligation to return property when its owner can be

---

[6] Similarly, many of the shareholders whose losses are highlighted herein were employees of the companies who issued the stock that was liquidated, and therefore their contact information was readily ascertainable.  *See, e.g.*, *Taylor v. Yee*, 780 F.3d 928 (9th Cir. 2015); *Vondjidis v. Hewlett Packard Corp.*, 85 Cal. Rptr. 3d 806 (Cal. Ct. App. 2009); *see also* Complaint, JLI Inv. S.A. v. Cook, No. 11274 (Del. Ch. July 9, 2015).

> located.    To do that, States must employ notification
> procedures designed to provide the pre-escheat notice the
> Constitution requires.

*Taylor*, 136 S. Ct. at 930 (Alito, J., concurring) (describing "blanket

newspaper notification[s]" as "decidedly old-fashioned methods that are

unlikely to be effective").

The district court's sanctioning of Hillsborough County's apathetic

approach to its constitutional notice requirements creates further cause for

concern within the securities context.    Federal law provides specific

requirements for the type of outreach to be afforded to lost or unresponsive

shareholders. *See* 17 C.F.R. § 240.17Ad-17.  State unclaimed property laws

differ in the type of notice permitted and often circumvent federal notice

requirements.  In the decision below, the district court allowed notice that

is not only constitutionally inadequate but also inconsistent with the SEC's

regulations related to lost or unresponsive shareholders, thereby

complicating the ability of *Amici*'s members to comply with conflicting

requirements.

2.     **Hillsborough County's Retention and Appropriation of Mr. Warner's Funds Without Just Compensation Violated the Takings Clause.**

The Fifth Amendment's Takings Clause, as applied to the states through the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation. The government has a categorical duty to pay just compensation when it takes personal property. *Horne v. Dep't of Ag.*, 576 U.S. 350, 358 (2015). It is settled "that the 'classic taking [is one] in which the government directly appropriates private property for its own use.'" *Id.* at 357–58 (alteration in original) (quoting *Tahoe—Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002)).

The physical appropriation of personal property is perhaps the most serious form of invasion of an owner's property interest, depriving the owner of the entire bundle of rights inherent in ownership, namely "the rights to possess, use and dispose" of the property. *Id.* at 361–62 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). This is true regardless of whether the taking is "permanent or temporary." *Cedar Point Nursery*, 594 U.S. at 153. An owner's claim for just

compensation arises "immediately" at the time of the taking. *Knick v. Twp. of Scott*, 588 U.S. 180, 189–90 (2019).

Here, Hillsborough County took custody of identifiable funds that Mr. Warner deposited into an escrow account during the pendency of his eviction proceedings. Because the County failed to return that property and deposited it into the county fine and forfeiture fund, this case presents a clear example of a *per se* taking, which requires just compensation to Mr. Warner. But he was given no compensation—much less *just* compensation.

The same frequently happens for shareholders. When states take custody of securities that are presumed unclaimed, they require that the shareholders' certificates be cancelled and reissued in the name of the state.[7] And when states liquidate the same without the shareholder's authority, the subsequent return of the proceeds from the sale cannot be considered just compensation to the shareholder. For instance, the

---

[7] *See* Fla. Div. of Unclaimed Property, Securities Transfer Information, https://www.myfloridacfo.com/appresources/UPMIS/HolderReporting/SECURITIES-TRANSFER-INFORMATION.pdf; Fla. Stat. § 717.122(c); *see also* Del. Code Ann. tit. 12, § 1153 (providing that securities in certificated form are to be delivered to the state as duplicate certificates in a form suitable for transfer; if the shares are in uncertificated form, the issuer shall cause the uncertificated security to be registered in the name of the State Escheator).

shareholder has lost any appreciation in value; the right to receive dividends; the right to vote on management recommendations; the right to participate in corporate actions; and the right to use and dispose of the property as the owner sees fit. Just compensation is "the full and perfect equivalent in money of the property taken," and "[t]he owner must be put in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943).

Like the raisin growers in *Horne*, owners of securities that have been taken and liquidated by the state have lost any right to control the disposition of their property due to unilateral government action without proper compensation. The payment of a fraction of the value of the property taken does not satisfy the government's categorical duty to pay just compensation. *Horne*, 576 U.S. at 367.

**3.    There Is Legally Insufficient Evidence Mr. Warner Abandoned His Property According to Florida Law, Supreme Court Precedent, and Founding-Era Understandings.**

Although states have an interest in taking possession of property that is *truly* abandoned, there was no voluntary relinquishment or renunciation of a property right here by Mr. Warner that could justify Hillsborough County's Due Process and Takings Clause violations. At a

minimum, Mr. Warner's actions raise a factual issue inappropriate for resolution on summary judgment. *See Jenkins v. United States*, 71 F.4th 1367, 1376 (Fed. Cir. 2023) (vacating grant of summary judgment because "competing theories raise[d] factual issues" as to whether plaintiff abandoned his property).

It is true that a person cannot be deprived of, or entitled to just compensation for, property he or she has affirmatively abandoned. But the circumstances in which a person's property interests are terminated by operation of law through abandonment are *limited*—both historically at common law and under Florida state law. *See Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638–39 (2023) (evaluating "traditional property law principles," "historical practice," and "precedents" to determine scope of property rights because "state law cannot be the only source"). It is imperative that states take only that property which has actually been abandoned.

In Florida, abandonment requires an owner to intentionally and unconditionally relinquish his or her interest in the property. *J.W. v. State*, 95 So. 3d 372, 375 (Fla. 3d DCA 2012); *see also Sea Servs. of Keys, Inc. v. Abandoned 29' Midnight Exp. Vessel*, 16 F. Supp. 2d 1369, 1372

16

(S.D. Fla. 1998) ("Dereliction or renunciation of property requires both the intention to abandon and external action[.]"); *State v. Schultz*, 388 So. 2d 1326, 1329 (Fla. 4th DCA 1980) ("Abandonment of personal property is the intention to part with the property forever."). Across jurisdictions, abandonment of a property interest requires a "voluntary intention to abandon, or evidence from which such intention may be presumed." *Katsaris v. U.S.*, 684 F.2d 758, 761–62 (11th Cir. 1982) (collecting cross-jurisdictional authority) ("[A]bandonment as applied to property and property rights has long had a generally accepted and well defined and technical meaning.").

As recently reiterated by the Supreme Court in *Tyler v. Hennepin County*, abandonment of property occurs only when the property owner—by express statement or conduct—has voluntarily relinquished all rights in the property and does so for a "lengthy period of time." 598 U.S. at 647; *see Texaco, Inc. v. Short*, 454 U.S. 516, 535–36 (1982) (upholding 20-year statutory period of non-use as sufficient to indicate abandonment of mineral rights); *Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 241 (1944) (property must be "inactive so long as to be presumptively abandoned" for it to be taken).

17

States may, of course, place "reasonable conditions" on property ownership—such as defining by statute when property is presumed abandoned. *Tyler*, 598 U.S. at 637 (citing *Texaco*, 454 U.S. at 526); *see United States v. Locke*, 471 U.S. 84, 104 (1985) (allowing only "reasonable restrictions" on property rights). But in *Tyler*, the Court rejected the argument that the owner's failure to comply with a "reasonable" condition of property ownership constitutes "abandonment." 598 U.S. at 647.

And in any event—like any other state action—those conditions are "subject to constitutional limitations." *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 435–36 (1951). For instance, states cannot "sidestep the Takings Clause" by codifying a presumption of abandonment based on a dormancy period that is unconstitutionally brief. *Tyler*, 598 U.S. at 638 (states cannot define property in a manner that "disavow[s] traditional property interests in assets [the state] wishes to appropriate"). Otherwise, "the Takings Clause would be a dead letter." *Id.* (quotation omitted); *see also Moore v. Harper*, 600 U.S. 1, 34 (2023) ("States may not, 'by *ipse dixit*, . . . transform private property into public property without

compensation.'" (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980)).

Here, Hillsborough County treated Mr. Warner's property as abandoned after only 15 months. But there is no historical practice of deeming property abandoned after this brief of a period, particularly where, as with securities, inactivity is inherent in the property type. *See Culley*, 144 S. Ct. at 1151–53 (using "historical practices" to assess Due Process claim); *Tyler*, 598 U.S. at 638–42 (same regarding Takings claim). Rather, the dormancy period has historically been significantly longer. *See, e.g.*, *Texaco*, 454 U.S. at 529 (property rights were not deemed abandoned until after 20 years); *Cerajeski v. Zoeller*, 735 F.3d 577, 579 (7th Cir. 2013) (same but 25 years); *Standard Oil*, 341 U.S. at 430 (same but 14 years); *see also* Bower, *supra*, 74 Ohio St. L.J. at 528 (discussing cases where the dormancy periods were as long as 30 years and noting the relatively recent phenomenon of reducing the statutory dormancy period as a way to increase revenue).

Indeed, the district court's decision *conflicts* with history and founding-era understandings. The Founders and other early Americans would not have permitted states to terminate private property rights

19

after only 15 months. That short period is not a "lengthy period of time." *See Tyler*, 598 U.S. at 647. By the time of America's founding, it was well understood that protecting private property is "necessary" and "indispensable" to preserving "individual freedom." *Cedar Point Nursery*, 594 U.S. at 147 (Roberts, C.J.) ("As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'" (quoting Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851))). The constitutional prerequisites of just compensation and due process are the safeguards that protect private property and "preserve freedom." *Id.*; *see Jones v. Flowers*, 547 U.S. 220, 234 (2006) ("[B]efore forcing a citizen to . . . forfeit[] his property, due process requires the government to provide adequate notice of the impending taking.").

The securities context highlights the problems with erroneous abandonment determinations. Florida recently amended its unclaimed property statute to deem abandoned any securities where the shareholder was considered inactive for just three years, despite

knowing that passive ownership is a highly common investment strategy.[8]

## B. The District Court's Erroneous Decision Has Nationwide Impact Because Thousands of Shareholders, Like *Amici*'s Constituents, Do Not Receive Adequate Notice or Just Compensation When the State Takes and Liquidates Securities.

State unclaimed property laws share a common problem: they are increasingly being used to take control of unclaimed property that is incorrectly considered "abandoned." Holders—the entities that are in possession of the property of others[9]—are required to communicate with property owners if it appears the owner has abandoned the asset due to a period of inactivity. The purpose of this outreach is to notify owners, and ultimately reunite them with their property, so that they do not lose the property as a result of escheatment.[10]

---

[8] Act of May 2, 2024, ch. 140, Fla. Laws; *see also* Fla. Stat. § 717.1101. Prior to this amendment, the statute required the shareholder to be "lost" (i.e., mail returned as undeliverable) before the property could be presumed abandoned.

[9] *See* Fla. Stat. § 717.101(16)(a).

[10] As in Mr. Warner's case, notice by the state often takes the form of publication, which is demonstrably inadequate. Some states, like Georgia, go so far as to indicate that it may liquidate securities upon receipt "*without further notification obligations*." Ga. Code Ann. § 44-12-217(b.1)(2) (eff. July 1, 2024) (emphasis added). If inadequate notice is unconstitutional, no notice is certainly unconstitutional.

But critically, the concepts of abandonment and escheatment are ill-suited for securities. Securities by design are intended to be held passively for extended periods of time without taking any action beyond intentionally passive ownership. Either because the issuer does not pay dividends[11] or because the shareholder may have elected to reinvest dividends automatically, such shareholder choice can look like "inactivity."[12] In reality, it is an *active* investment strategy supported by much conventional wisdom.[13] It is also historically one of the best economic uses of securities.

---

[11] Many issuers of securities do not pay dividends in favor of reinvesting in the company. Examples include Berkshire Hathaway, Google, Amazon, Express Scripts, eBay, and AIG.

[12] *See, e.g.*, Fla. Stat. § 717.1101(2) (the dormancy period is tolled only if the owner cashes a dividend check or communicates in writing with the holder "as evidenced by a memorandum or other record on file" with the holder); *see also* 765 Ill. Comp. Stat. Ann. 1026/15-210(b) (an indication of an owner's interest in property includes a deposit into or withdrawal from an account at a financial organization, "*except for* . . . an automatic reinvestment of dividends or interest . . .") (emphasis added).

[13] Passive investing is a long-term investment strategy that focuses on buying and holding investments for the long term, and it is highly recommended for owners who seek to gradually build wealth, diversify their portfolios, and avoid the fees and limited performance that may occur with frequent trading. *See* Kathleen Elkins, *Warren Buffett and Jack Bogle agree on the formula for long-term success: 'Buy and hold'*, CNBC: Money (Sept. 18, 2018), https://www.cnbc.com/2018/09/18/warren-buffett-and-jack-bogle-

This intentional exercise of ownership often lasts longer than the state-law dormancy periods (which are increasingly being shortened) that undergird escheatment statutes.[14]  As a result, shareholders across the country have faced significant loss by having their securities erroneously deemed unclaimed pursuant to a state statute, without actual abandonment.

What's more, states like Florida do not hold shares in custody for the benefit of the owners but rather liquidate shares upon receipt, thereby guaranteeing that the owner's so-called "abandoned" property interests are forever altered and that owners cannot receive back the full

---

recommend-buying-and-holding.html; Trent Gillies, *Warren Buffet: Buy, hold and don't watch too closely*, CNBC (Mar. 5, 2016), https://www.cnbc.com/2016/03/04/warren-buffett-buy-hold-and-dont-watch-too-closely.html ("Buy-and-hold is the best strategy. 'The money is made in investments by investing . . . and by owning companies for long periods of time.'"); Rick Ferri, *Set it and Forget it Works*, Forbes (June 11, 2015),       https://www.forbes.com/sites/rickferri/2015/06/11/set-it-and-forget-it-works/?sh=7f04ed446e61.

[14] *See, e.g.*, *Taylor*, 136 S. Ct. at 930 (Alito, J., concurring) (noting that several states in recent years have "shortened their dormancy periods from as long as 15 years to merely 3").  For instance, the 1981 Uniform Unclaimed Property Act provided a 7-year dormancy period for securities.  Unif. Unclaimed Prop. Act, § 10.  That period was reduced to a 5-year dormancy period in 1995.  Unclaimed Prop. Act, § 2(a)(3).  And in 2016, it was further reduced to a 3-year dormancy period.  Revised Unif. Unclaimed Prop. Act, § 208.

value of what was taken.[15]  *See Taylor v. Yee*, 780 F.3d 928 (9th Cir. 2015).  While Florida may pay the owner the net proceeds it received from the sale of the securities, such payment does not constitute just compensation under the Constitution.  The bundle of property rights represented by the liquidated securities has been destroyed.[16]  Additionally, net proceeds are often dramatically less than the amount needed to buy back the same number of shares escheated.[17]

Losses are often in the millions, include sums that shareholders count on for retirement, and can even be irreversible at times, such as

---

[15] Fla. Stat. § 717.122(2)(b).  This provision mirrors that of Alabama and Georgia, which each allow the state to liquidate securities upon receipt.  Ala. Code § 35-12-80(b); Ga. Code Ann. § 44-12-217(b.1)(2).  This issue isn't unique to states in the Eleventh Circuit.  An additional sixteen (16) jurisdictions essentially permit or require immediate liquidation.  The remaining states provide for a holding period of between 1 year and 3 years, caveated with the indication that a liquidation may take place sooner if it is deemed in the best interest of the state.  *See, e.g.*, Iowa Code § 556.17(5); N.H. Rev. Stat. Ann. § 471-C:24(III); Va. Code Ann. § 55.1-2529(C).

[16] Likely to prevent the alienation of the ownership interests securities represent, the 1954 and 1966 Uniform Unclaimed Property Acts provided for the escheatment of dividends only.  It was not until 1981 that underlying securities were also considered escheatable, and even then, with longer dormancy periods and strict conditions precedent.  *See* Unif. Unclaimed Prop. Act, § 10, Comment (1981); *see also supra* at note 14.

[17] *See, e.g.*, *Azure Ltd. v. I-Flow Corp.*, 210 P.3d 1110 (Cal. 2009); *Harris v. Verizon Commc'ns*, 46 Cal. Rptr. 3d 185 (Cal. Ct. App. 2006); *A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114 (Del. 2009).

when there are tax consequences, penalties for early distribution of an asset that was slated for retirement, or when the mutual fund is closed to new investors by the time that a claim for the property has been paid.[18] In one case, the state sold the shares three days after receipt, but then communicated with the shareholder for two years without acknowledging the sale, during which time the shares increased to a value of over $13,000,000—a value the shareholder did not receive. Complaint, JLI Inv. S.A. v. Cook, No. 11274 (Del. Ch. July 9, 2015). Disenfranchised shareholders who learn that their securities have been sold by the state are left with no option but to file costly litigation in an attempt to recover the true value of the shares they formerly owned. These actions typically name the state, the issuer who escheated the shares, and the issuer's transfer agent as defendants.[19]   This risk complicates compliance for *Amici*'s members, who are nonetheless

---

[18] *Barron v. Fid. Magellan Fund*, 784 N.E.2d 634 (Mass. App. Ct. 2003).

[19] *See, e.g.*, Amended Complaint, Salvato v. Harris, No. 3:21-cv-12706 (D.N.J. June 10, 2022); Complaint, Peters v. Yee, No. 3:21-cv-01125 (S.D. Cal. June 16, 2021); Complaint, Merril v. Computershare Inc., No. 1:21-cv-00811 (N.D. Ohio Apr. 16, 2021); Complaint, Sotos v. Computershare Trust Co., N.A., No. 3:15-cv-00818 (D. Conn. May 29, 2015).

sympathetic to the plight of shareholders whose property has been taken by the state.

These problems are exacerbated by the fact that most states, including Florida, hire private contract auditors on a contingency-fee basis to examine a holder's compliance with unclaimed property laws.[20] Just as the Clerk's fine and forfeiture fund swells with seizures of allegedly unclaimed court deposits, the auditors' compensation is based upon the value of the property they report to the state as abandoned. This inherent conflict provides a clear motive for the auditors to rely on constitutionally deficient interpretations of unclaimed property laws to demand that property be turned over to the state even when it is not lost

---

[20] *See* Fla. Stat. § 717.101(4) (defining "audit agent" as one "with whom the department enters into a contract with to conduct an audit or an examination"); *see also Dep't of Fin. v. AT&T Inc.*, 239 A.3d 541, 576 (Del. Ch. 2020) ("Kelmar is compensated contingently. That arrangement . . . creates a pernicious incentive for Kelmar to . . . engage in expansive audits that impose substantial burdens on companies, thereby inducing settlements that generate income for Kelmar. The breadth of the Subpoena in this case is suggestive of such tactics."); *Marathon Petroleum Corp.*, 876 F.3d at 497 ("Kelmar's financial incentive to claim as much escheatable property as possible taints the entire process with an appearance of self-interested overreaching."); *Cf. Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that an individual is deprived of due process when his property is subject to the judgment of a court in which the decision maker has a pecuniary interest in the outcome).

or abandoned under the relevant statute. Such perverse incentives have "wormed their way into the system" to create a troubling, "booming business" that is at odds with "a Nation so jealous of its liberties." *See Culley*, 144 S. Ct. at 1154, 1158 (Gorsuch, J., concurring).

These issues are not limited to Florida's "admittedly opaque" escheatment laws. *See* Brief of Appellant at 19 n.10. The unclaimed property laws of all states contain notice[21] and compensation[22] provisions similar to, or less adequate than, those adopted by Florida. Accordingly, property owners everywhere will potentially be harmed if the district court's decision stands, as it will pave the way for states to escheat unclaimed property (1) without providing notice reasonably designed to inform the owner of the state's actions; and (2) without requiring just compensation to the owner. If it stands, the district court's opinion will also

---

[21] *See, e.g.*, Ala. Code § 35-12-80(a) ("A sale held under this section shall be preceded by *a single publication of notice*, at least three weeks before sale, in a newspaper of general circulation in the county in which the property is to be sold.") (emphasis added); Ga. Code Ann. § 44-12-217(b.1)(2) ("[A]ll securities presumed unclaimed and delivered to the department may be sold upon receipt *without further notification obligations*.") (emphasis added).

[22] *See, e.g.*, Fla. Stat. § 717.122(2)(b) ("[N]o person has any claim under this chapter against the state . . . for any appreciation in the value of the property occurring after delivery by the holder to the state.); Ala. Code § 35-12-80(c) (similar); Ga. Code Ann. § 44-12-217(b.1)(2) (similar).

27

embolden states to continue to demand the escheatment of securities that are in fact not unclaimed while disregarding the constitutional rights of owners.

All told, ensuring appropriate constitutional safeguards on unclaimed property laws will allow issuers and transfer agents to perform their duties without fear of litigation and will help restore the escheatment scheme to one that protects the property interests of rightful owners.

## CONCLUSION

For these reasons, this Court should reverse the judgment of the district court.

Dated:  May 29, 2024                  Respectfully submitted,

/s/ *Elizabeth Scott*
Elizabeth D. Scott
Matthew E. Myatt
Stephanie Ondrof (*pro hac vice pending*)
Jerome Berger (*pro hac vice pending*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field St., Suite 1800
Dallas, TX  75201
edscott@akingump.com
mmyatt@akingump.com
sondrof@akingump.com
bergerj@akingump.com

Jennifer Borden
Borden Consulting Group, LLC
71 Commercial St., Suite 198
Boston, MA 02109
jborden@jbordenlaw.com

*Attorney for Amici Curiae*
*Shareholder Services Association and*
*Securities Transfer Association*

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a) and 32(a)(7)(B) because this brief contains 5,747 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Office 365 in 14-point Century Schoolbook.

Dated:  May 29, 2024          /s/ *Elizabeth D. Scott*

                                     Elizabeth D. Scott

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, I electronically filed the foregoing *amici curiae* brief using the court's CM/ECF system. All of the participants are registered CM/ECF users and will be served copies of the foregoing brief via the CM/ECF system.


Dated: May 29, 2024                /s/ *Elizabeth D. Scott*
                                   Elizabeth D. Scott