IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

USCA Case No. 24-10748
United States District Court, Middle District of Florida
Case No.: 8:22-cv-01977

BLAKE WARNER,

Plaintiff/Appellant

v.

HILLSBOROUGH COUNTY CLERK OF COURTS,

Defendant/Appellee.

## ANSWER BRIEF OF APPELLEE

KRISTEN M. FIORE, BCS (25766)
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

JASON L. MARGOLIN (69881)
**AKERMAN LLP**
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone:  (813) 209-5009
Facsimile:   (813) 223-2837
jason.margolin@akerman.com

ATTORNEYS FOR APPELLEE

USCA Case No. 24-10748

*Blake Warner v. Hillsborough County Clerk of Courts*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE PURSUANT TO FRAP 26.1 AND 11TH CIR. R. 26.1-1

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, Appellee, HILLSBOROUGH COUNTY CLERK OF COURTS, by and through its undersigned counsel, hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Akerman LLP (Attorneys for Appellee)

2. Baker Botts LLP (Attorneys for Appellant)

3. Brathwaite Law, PLLC (Former Attorneys for Appellee)

4. Brathwaite, Patrick Sherman (Former Attorney for Appellee)

5. Bowen, Brad (Attorney for Appellant)

6. Erickson, Matthew P. (Attorney for Appellant)

7. Fiore, Kristen M. (Attorney for Appellee)

8. Hilderbrand, Matthew M. (Attorney for Appellant)

9. Hillsborough County Clerk of Courts (Appellee)

10. Margolin, Jason L. (Attorney for Appellee)

11. Moran, Gregg (Attorney for Appellee)

C-1

USCA Case No. 24-10748

*Blake Warner v. Hillsborough County Clerk of Courts*

12. Scriven, Mary S., U.S. Dist. Judge (M.D. Fla.)

13. Streett, Aaron M. (Attorney for Appellant)

14. Tankel, Megan (Attorney for Appellant)

15. Walk, Rochelle (Mediator)

16. Warner, Blake (Appellant)

C-2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is unnecessary because this appeal involves straightforward issues on which the law is clear and that are fully-briefed by the parties.

76666615;12

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

   CORPORATE DISCLOSURE STATEMENT ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES .....................................................................iv

STATEMENT OF THE ISSUE...................................................................1

STATEMENT OF THE CASE....................................................................2

    *Statement Of The Facts* .........................................................4

    *Course Of Proceedings Below*.....................................................8

    *Standard Of Review* .............................................................10

SUMMARY OF THE ARGUMENT ..................................................................11

ARGUMENT .....................................................................................13

    I.    **WARNER'S BRIEF NEVER ADDRESSES THE STANDARDS FOR FACIAL ATTACKS ON STATUTES, AND FLORIDA'S STATUTORY PROVISIONS COMPLY WITH THE CONSTITUTION** .............13

    II.   **THE CLERK'S ACTIONS WERE CONSTITUTIONAL AS APPLIED TO WARNER'S SITUATION** ..................................20

        A.  The Constitution establishes a <u>floor</u> of rights; the legislatures of this country establish its contours. The Clerk fully complied with Florida's specific contours....................20

B.  Warner's efforts to disparage *La Gaceta* are
    unpersuasive .....................................................................22

C.  Nothing in the Constitution supports Warner's
    arguments about what the Clerk supposedly should
    have done .........................................................................25

D.  This case actually arises from Warner's inexplicable
    inaction ............................................................................29

III.  **THE TAKINGS CLAUSE DOES NOT APPLY TO THIS
      CASE, AND  WARNER'S TAKINGS ARGUMENTS
      ARE MERITLESS** ..............................................................36

A.  Warner's brief never addresses *Bennis v. Michigan*, a
    chief case applicable to his purported "takings" claim ..................36

B.  Warner's efforts to distinguish the *Texaco* case are
    unpersuasive .....................................................................39

CONCLUSION ....................................................................................45

CERTIFICATE OF COMPLIANCE ......................................................47

CERTIFICATE OF SERVICE  ..............................................................47

<u>**TABLE OF AUTHORITIES**</u>

**Page**

<u>**CASES**</u>

*Acevedo v. First Union Nat'l Bank,*
   476 F.3d 861 (11th Cir. 2007) ........................................................................13

*Ashwander v. TVA,*
   297 U.S. 288 (1936) ........................................................................................14

*Ayotte v. Planned Parenthood of N. New Eng.,*
   546 U.S. 320 (2006) ........................................................................................14

*\*Bennis v. Michigan,*
   516 U.S. 442 (1996) ........................................................ 12, 36, 37, 38, 39, 40

*Boutique Apartments LLC v. Warner,*
   Case No. 18-CC-022377 ....................................................................................4

*\*Bracy v. Gramly,*
   520 U.S. 899 (1997) ........................................................................11, 14, 20, 24

*Caban Hernandez v. Philip Morris USA, Inc.,*
   486 F.3d 1 (1st Cir. 2007) ..............................................................................16

*Campbell-Ewald Co. v. Gomez,*
   136 S. Ct. 663 (2016) ......................................................................................34

*Castro v. U.S.,*
   540 U.S. 375 (2003) ........................................................................................19

*Cerajeski v. Zoeller,*
   735 F.3d 577 (7th Cir. 2013) ..........................................................................26

*Chernin v. Welchans,*
   844 F.2d 322 (6th Cir. 1988) ....................................................................15, 42

*Crowell v. Benson,*
   285 U.S. 22 (1932) ..........................................................................................44

iv

*Davis v. Hillsborough Cty.*, Case No. 8:20-cv-0167,
  2020 WL 7041762 (M.D. Fla. Dec. 1, 2020) ..................................................... 21

*Dogan v. Roe*,
  8 F. App'x 612 (9th Cir. 2001) ........................................................................ 27

*Dominguez v. U.S. Atty. Gen.*,
  284 F.3d 1258 (11th Cir. 2002) ....................................................................... 41

*Faretta v. Cal.*,
  422 U.S. 806 (1975) ........................................................................................ 30

*Greenlaw v. U.S.*,
  554 U.S. 237 (2008) ........................................................................................ 19

*Hamilton v. Southland Christian Sch., Inc.*,
  680 F.3d 1316 (11th Cir. 2012) ...................................................................... 22

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................... 13, 20, 44

*Jones v. Flowers*,
  547 U.S. 220 (2006) .................................................................................. 19, 28

*Kohl v. U.S.*,
  91 U.S. 367 (1875) .......................................................................................... 38

*McNeil v. U.S.*,
  508 U.S. 106 (1993) ........................................................................................ 30

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) .................................................................................... 14

*Morrissey v. Brewer*,
  408 U.S. 471 (1972) .................................................................................. 13, 20

*Netzer v. Office of Lawyer Regulation*,
  851 F.3d 647 (7th Cir. 2017) .......................................................................... 16

v

*Outler v. U.S.*,
485 F.3d 1273 (11th Cir. 2007) ...................................................27, 30

*Rushing v. Kansas City Southern Ry. Co.*,
185 F.3d 496 (5th Cir.1999) ...........................................................16

*Sabri v. U.S.*,
541 U.S. 600 (2004) .....................................................................14

*Sylvia Landfield Tr. V. City of Los Angeles*,
729 F.3d 1189 (9th Cir. 2013) .......................................................42

*\*Texaco, Inc. v. Short*,
454 U.S. 516 (1982).............................. 11, 12, 17, 26, 27, 29, 37, 38, 39, 40, 41

*U.S. v. Ballinger*,
395 F.3d 1218 (11th Cir. 2005) ......................................................10

*U.S. v. Durham*,
795 F.3d 1329 (11th Cir. 2015) ......................................................22

*U.S. v. Estrada-Trochez*,
66 F.3d 733 (5th Cir. 1995) ..........................................................41

*U.S. v. Evans*,
476 F.3d 1176 (11th Cir. 2007) ......................................................10

*U.S. v. Hung Thien Ly*,
646 F.3d 1307 (11th Cir. 2011) ......................................................30

*U.S. v. Salerno*,
481 U.S. 739 (1987)...................................................................11, 13

*U.S. ex rel. Tenn. Valley Auth. v. Powelson*,
319 U.S. 266 (1943) ...................................................................38

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993)....................................................................34

vi

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)...................................................................................21

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)......................................................11, 13, 14, 19

## STATUTES AND CODE PROVISIONS

Chapter 717, Fla. Stat...............................................................................9

§ 50.11(1), Fla. Stat...............................................................................18

§ 50.0211, Fla. Stat. ....................................................................18, 24, 29

§ 50.0211(3), Fla. Stat..........................................................................18

§ 83.60, Fla. Stat. ..........................................................4, 15, 25, 42, 43

§ 83.60(2), Fla. Stat...............................................................................25

§ 116.21, Fla. Stat. ........................ 1, 2, 5, 7, 8, 9, 13, 15, 16, 24, 26, 28, 35, 44, 45

§ 116.21(1), Fla. Stat..........................................5, 7, 16, 17, 25, 44

§ 116.21(2), Fla. Stat...............................................................................17

§ 717.113, Fla. Stat. ...............................................................................9

## RULES AND REGULATIONS

11th Cir. R. 26.1-1 ...............................................................................C-1

Fed. R. App. P. 26.1 ...............................................................................C-1

Fed. R. App. P. 32(a)(5).........................................................................47

Fed. R. App. P. 32(a)(6).........................................................................47

Fed. R. App. P. 32(a)(7)(B) ...................................................................47

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................................47

Fed. R. Civ. P. 1 .....................................................................................43

Fed. R. Civ. P. 1.010 ...............................................................................43

## **OTHER AUTHORITIES**

https://laws.flrules.org/2021/17 ................................................................7

https://laws.flrules.org/2022/103 ..............................................................7

1991 Op. Att'y Gen. Fla. 261, 1991 WL 528175 (1991) .........................19

Fla. Att'y Gen. Op. 99-64, 1999 WL 979659 (1999) ..............................16

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether section 116.21, Florida Statutes, which permits unclaimed court-related funds collected or deposited by the Hillsborough County Clerk of Court (the "Clerk") to be deposited into the fine and forfeiture fund following publication in a newspaper of general circulation within the county, is facially unconstitutional.

II.    Whether the Clerk's compliance with section 116.21 was unconstitutional *as applied to* Appellant Blake Warner.

III.    Whether the Clerk's compliance with section 116.21 resulted in an unconstitutional taking.

## STATEMENT OF THE CASE[1]

This case involves a dispute over $3,600, which Appellant Blake Warner deposited into the court registry in defense of an eviction action, and then abandoned for nearly three years. Now, Warner seeks to turn his failure to timely act into an attack on the constitutionality of the State of Florida's statutory procedure under section 116.21, Florida Statutes, for the publication of notices regarding unclaimed court-related funds. In the eviction action, the county court verbally indicated entitlement to the funds belonged to Warner's landlord (<u>not</u> to Warner) at a hearing held in October 2018. Warner asserts he negotiated with his landlord after the hearing and reached an unfiled agreement that he could move for the funds.

And then Warner took no action for several years.

Warner: (1) never filed any written documentation to indicate he (and not his landlord) was the party entitled to the funds; (2) never filed any document seeking entitlement or disbursement of the funds; (3) failed to file any notices apprising the court (and thus, the Clerk) of his current address after moving a second time,[2] despite

---

[1] This brief cites to district court docket entries by docket entry number and page number (*i.e.*, [Doc. 1 at 1] references docket entry 1 at page 1), and the Principal Brief and Amici Brief by page number (*i.e.*, [PB 1] references Principal Brief page 1); [AB 1] references Amici Brief page 1).

[2] Warner did file a notice of change of address the first time he moved. [Doc. 36 ¶ 7; Doc. 36-2] But he failed to do so the second time, when he moved away from the address where notice was sent. As explained below, his failure to file a notice

the local rule obliging him to maintain an up-to-date address with the court; (4) never sought an order from the court identifying him as the owner of the funds; and (5) never checked (or at least never acted upon checking) the online docket or any readily available sources regarding the funds, even after the case was dismissed for lack of activity. Warner's inaction with respect to the court-deposited funds lasted over a nearly-three-year-period before the funds were forfeited in September 2021. Neither Warner nor the landlord presented any proposed order awarding the funds (as the court requested).

Warner's only explanation for his lack of diligence is that he "believ[ed] [the money] would be safe" in the court registry. [PB 8] Apparently he believed it would be so safe, he did not bother to update his mailing address or monitor the docket for his eviction case. Having ignored the case for too long to his own detriment, Warner seeks to challenge the constitutionality of Florida law setting the timeline and process for forfeiture. But Warner's Due Process and Taking Clause challenges fail under the law:

1. Warner's facial challenge under the Due Process Clause is meritless; Florida's statutory framework provides more than fair notice in all cases (including this one). *Infra* Section I.

---

following the second move is additional evidence of inaction and waiver, especially where he knew to file, and had filed, a notice after the first move.

76666615;12

2.  Warner received full and fair notice of his obligations, and the Clerk's compliance with valid Florida law ensures it too complied with the Due Process Clause. *Infra* Section II.

3.  Warner never experienced a taking. *Infra* Section III.

Accordingly, the Court should affirm in all respects.

### *Statement Of The Facts*

The relevant facts are different than how Warner portrays them.

This litigation stems from an eviction action Warner's then-landlord initiated against him in 2018 in the county court of Hillsborough County, *Boutique Apartments LLC v. Warner*, Case No. 18-CC-022377 (the "Eviction Action"). [Doc. 36 ¶ 2] In his opposition to the Eviction Action and in accordance with the county court's order and section 83.60, Florida Statutes, Warner deposited $3,600 into the court's registry by May 2018. [Doc. 36 ¶¶ 3, 4; Doc. 36-1]

During the course of the Eviction Action, Warner moved homes twice. His address at the start of the litigation was on De Leon Street, but he moved to Fremont Avenue on June 22, 2018. [Doc. 36 ¶¶ 5–7] When Warner moved to Fremont Avenue, he filed a notice of address change, as he was required to do under the Hillsborough County Court's local administrative rules. [*Id.* at ¶ 7; Doc. 36-2 (Warner's actual notice of address change filed June 22, 2018); *see also* Doc. 21, at 3; Doc. 21-2; Doc. 21-3; Doc. 21-4 (requiring notices of address changes)]

Warner later moved away from the Fremont Avenue address, but inexplicably did not file an updated change of address. [Doc. 36 ¶¶ 8, 15]

From there, the relevant timeline differs greatly from what Warner and the Amici portray. Warner and the Amici focus on the "fifteen months" (presumably between the June 12, 2020 dismissal of the Eviction Action for lack of prosecution and the September 2021 disposition of the funds pursuant to section 116.21, Florida Statutes), but the relevant time period is actually closer to three years. *See, e.g.*, [PB iii, 1, 8, 14, 19 n.10, 30, 37 (suggesting the Clerk's position is that the property was "abandoned" under Florida law after a mere fifteen months); AB 8 (same)] Warner and the Amici fail to consider the time of the deposit and the date of the court's ruling on the landlord's entitlement to the funds. Notably, the shortest possible timeframe under this Florida law would be twenty-one months and would require an eviction to both begin and end within the month of December in year one, which would result in a forfeiture in September of year three (*i.e.*, a period of twenty-one months at an absurd minimum and only where a case was commenced and terminated within the month of December). § 116.21(1), Fla. Stat.

On October 9, 2018, several months after Warner deposited the necessary rent amounts into the registry, the court heard and ruled on multiple motions in the Eviction Action, determining Warner's landlord (not Warner) was entitled to the

registry funds. *See* [Doc. 36-3 ("Court to disburse $3398 to the plaintiff."); 36 ¶ 12] The court directed the plaintiff/landlord to submit an order. *See* [*id.*].

With respect to the landlord's motion to dismiss Warner's counterclaims in the Eviction Action, the court entered an order dated February 12, 2019, granting the motion in part. The parties to the Eviction Action did not submit any order as to the funds. *See generally* [Doc. 33-1].

Warner alleges he entered into an agreement with his landlord under which Warner would abandon his remaining counterclaims, and in exchange, the landlord would allow Warner to claim the court registry funds. *See* [Doc. 36 ¶ 13]. There is no written record or evidence of this alleged agreement in the Eviction Action. *See generally* [Doc. 33-1]. Although the Clerk did not challenge Warner's assertion regarding the alleged agreement between Warner and his landlord below, it is important to note that any investigation of the Eviction Action record would reflect the court had determined the landlord (not Warner) was supposed to file a proposed order requesting the funds. *See* [Doc. 36-3]. Thus, even if the Clerk were obligated to search for the owner (the Clerk was not obligated to do so here), then the Clerk might only have needed to take further action to notify the landlord (not Warner).

On February 12, 2020 and March 30, 2020, notices of intent to dismiss for lack of prosecution were filed in the Eviction Action. [Doc. 33-1]

6

On June 12, 2020—over twenty months after the hearing in which the court determined the landlord was entitled to the funds—the Hillsborough County Court dismissed the Eviction Action for a lack of prosecution given the lack of any action by the parties. [*Id.* at ¶ 16]

Another eight months passed, and in February 2021—twenty-eight months after the hearing in which the court determined the landlord was entitled to the funds—the Clerk began mailing letters to both the landlord and Warner. [*Id.* at ¶ 17] Importantly, the Clerk was never obligated under Florida law (or, by extension, the Constitution, *infra* Section II.C) to mail any notices; its only obligation was to publish notice in a newspaper of general circulation. § 116.21(1), Fla. Stat.

On July 9, 2021—about thirty-three months after the hearing in which the court determined the landlord was entitled to the funds—in accordance with section 116.21, the Clerk published notice of the unclaimed funds in the newspaper *La Gaceta*. [Doc. 36 ¶ 19]

Notably, none of the parties to this appeal (including the Amici) dispute that the choice to publish in *La Gaceta* complied with Florida's statutory framework; the arguments are limited strictly to the constitutional questions. *See generally* [PB; AB].[3] The actual edition of *La Gaceta*, available online and containing the relevant

---

[3] The specifics of Florida's law changed in 2021, with those changes available at https://laws.flrules.org/2021/17, and then again in 2022, with those changes available at https://laws.flrules.org/2022/103. The broad strokes of law at issue here

notice publication, speaks for itself (in English, Spanish, and Italian) and refutes Warner and the Amici's mischaracterization of the publication as only a "Spanish-language paper periodical," *see* [PB iii], and a "non-English periodical," *see* [AB 3].

Several more months passed, and the funds were finally forfeited in September 2021 in accordance with section 116.21. [Doc. 36 ¶ 20]

Accordingly, the relevant time period in this case runs from the court in the Eviction Action determining on October 9, 2018 that Warner's landlord was entitled to the registry funds, *see* [Doc. 36-3 ("Court to disburse $3398 to the plaintiff."); 36 ¶ 12], to the forfeiture in September 2021, *see* [Doc. 36 ¶ 20]. Thus, the relevant time period spans thirty-five months—nearly three years. *See* [*id.*].

### *Course Of Proceedings Below*

Warner filed his complaint in this action in August 2022. [Doc. 1] The complaint asserted five counts: (1) alleged violations of the Due Process Clause, (2) a takings claim, (3) embezzlement, (4) defamation *per se*, and (5) First Amendment retaliation. [*Id.* at ¶¶ 43–66] The Clerk filed a motion for judgment on the pleadings, and Warner filed a response. [Doc. 21, 23] The motion and the response remained pending at the time the District Court granted summary judgment. *See* [Doc. 44].

---

though remain unchanged; the law was constitutional back in 2021, just as it remains constitutional today. And in any event, the undisputed conclusions of the District Court are that publication in *La Gaceta* complied. [Doc. 50, at 8–9]

8

Later in the case, the parties filed cross motions for summary judgment. [Doc. 33, 37-38, 40-43] The District Court granted the Clerk's summary judgment motion and denied Warner's. [Doc. 50] With respect to the due process claim, the District Court found the Clerk followed Florida law, and publication in *La Gaceta* was sufficient notice. [*Id.* at 8–10] For the takings claim, the District Court found Florida's statutory framework complied with Supreme Court precedent, and the forfeiture was not a constitutional "taking." [*Id.* at 10–12] The District Court also granted judgment for the Clerk on Warner's remaining claims. [*Id.* at 12–18]

For purposes of this appeal, Warner abandoned every argument other than the facial due process challenge, the as-applied due process challenge, and the takings claim. [PB 1, 12 n.5] Additionally, Warner concedes that the only statute at issue is section 116.21. [*Id.* 19 n.10 ("[T]he district court held and [the Clerk] has maintained that section 116.21 applies in this case. Thus, Warner launches a facial attack on section 116.21 as interpreted by the district court and [the Clerk].").[4]

---

[4] There was some argument regarding Chapter 717, Florida Statutes, at the district court level, and whether it applied over section 116.21. To the extent any confusion remains, section 717.113, Florida Statutes, by its own terms states that it does not apply to money "in the court registry and for which no court order has been issued to determine an owner . . . ." *See* [Doc. 36 ¶¶ 12, 14 (noting the court asked the landlord to submit an order, but neither party ever did so)].

***Standard Of Review***

The constitutionality of a statute or its application is subject to *de novo* review. *U.S. v. Evans*, 476 F.3d 1176, 1178 (11th Cir. 2007); *U.S. v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005).

76666615;12

## SUMMARY OF THE ARGUMENT

The District Court's order was correct. Warner's facial challenge to Florida's statutory framework is untenable. It ignores the actual standard Warner must show: That the statute is unconstitutional in *every* possible setting. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–51 (2008) (quoting *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)). Warner and the Amici overlook the numerous safeguards built into the law, such as the availability of free, online access to legal notices. Independently, they ignore the publication of the law, which itself serves as a type of notice. *Texaco, Inc. v. Short*, 454 U.S. 516, 531–32 (1982) ("Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply."). These types of safeguards represent the general idea that "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard," and legislatures are responsible for establishing its contours in particular situations. *Bracy v. Gramly*, 520 U.S. 899, 904 (1997).

Warner's as-applied challenge also lacks merit. As explained above, the policy matters the Florida legislature decided to implement are themselves protections, and the Clerk complied with them. *Infra* Section II.A. In this appeal, there is no dispute that the Clerk fully complied with Florida's statutory framework. *See generally* [PB (never suggesting a lack of statutory compliance)]. Likewise,

11

Warner's own numerous failings—chiefly his complete lack of attention to the money for which he specifically bargained with his landlord—warrant denying his requested relief. *Infra* Section II.D.

Finally, Warner's takings claim is a nonstarter. This case does not involve a taking; takings arise only in the context of eminent domain. *Bennis v. Michigan*, 516 U.S. 442, 452 (1996). Moreover, "[t]he requirement that an owner of a property interest . . . must come forward and file a current statement of claim"—as was the situation here—"is not itself a 'taking,'" *Texaco*, 454 U.S. at 530; [Doc. 36 ¶ 12 (noting that a simple proposed order disbursing the funds would have been sufficient to claim them)] The District Court's opinion on the takings claim relied on this principle, yet Warner fails to address it, focusing instead on abstract questions of whether he had a "property interest." *See* [PB 31].

Accordingly, all of Warner's claims on appeal fail. He asks the Court to both issue a sweeping constitutional order upending Florida's statutory scheme, while simultaneously ignoring his own inaction and failure to comply with the court's requirements in the Eviction Action. Any forfeiture Warner might have experienced is the result of his own inaction. Requiring Warner to know and follow the law is not overly burdensome—the law allows *pro se* parties to represent themselves, but does not permit claimed ignorance of the law as a defense or excuse any party

(represented or not) from knowing its obligations. As a result, the Court should affirm in all respects.

## ARGUMENT

### I.   WARNER'S BRIEF NEVER ADDRESSES THE STANDARDS FOR FACIAL ATTACKS ON STATUTES, AND FLORIDA'S STATUTORY PROVISIONS COMPLY WITH THE CONSTITUTION.

Initially, Warner argues section 116.21 is facially unconstitutional—*i.e.*, he asserts the entirety of the law is unconstitutional in every setting. [PB 18–22] But Warner never addresses the applicable standard.

To succeed in a facial attack, a plaintiff must demonstrate there is no set of circumstances under which the challenged law would ever be valid. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–51 (2008) (quoting *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)).[5] Warner cannot rule out all circumstances for this law because—as explained below—he cannot even show it was invalid as applied here.

Relatedly, the Constitution represents a floor of protections; determining the flexible details above that floor is reserved for the people through the political branches of government. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) ("'[D]ue process is

---

[5] Notably, newspaper publication as a general form of notice can comply with the Due Process Clause. *E.g.*, *Acevedo v. First Union Nat'l Bank*, 476 F.3d 861, 866 (11th Cir. 2007).

flexible,' we have stressed repeatedly, and it 'calls for such procedural protections as the particular situation demands.'"); *Bracy v. Gramly*, 520 U.S. 899, 904 (1997) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."). Warner and the Amici cannot dictate the exact additional protections they would prefer because anything above the "floor" is reserved for the legislature.

"Facial challenges are disfavored for several reasons." *Wash. State Grange*, 552 U.S. at 450. First, they often rest on speculation, which reduces the amount of available information and increases the risks of premature interpretation. *Id.* at 449–51 (quoting *Sabri v. U.S.*, 541 U.S. 600, 609 (2004)). Second, facial challenges "run contrary to the fundamental principle of judicial restraint" and thus, courts should avoid unnecessary constitutional questions and should not "formulate a rule of constitutional law broader than is required by the precise facts to which it [the challenges are] applied." *Id.* (quoting *Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring)). Finally, facial challenges turn flexible policy decisions, properly decided through the legislative process, into rigid, nationwide requirements that are comparatively difficult to change (requiring an overruling or other judicial process). *Id.* (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)); *see also Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) ("NetChoice chose to litigate these cases as facial challenges, and that

14

decision comes at a cost. . . . This Court has . . . made facial challenges hard to win.").

Here, Warner seeks a broad declaration that the Florida publication requirement is unconstitutional and demands that the Court proscribe a broad rule that would require government agencies to search for litigants even if it means trying to contact them at their "mother's address." *See* [PB 8]. Rather than acknowledge the full context of the applicable Florida Statutes, Warner presents a caricature of the law to the Court, claiming "it requires no more notice than publication in a foreign-language periodical." [PB 18] Yet the law is more nuanced and comprehensive.

First, section 83.60, Florida Statutes, strikes a balance between the interests of tenants and landlords by allowing tenants to "withhold" rent when defending against evictions (as a lack of habitable conditions might alleviate the obligation to pay) while still ensuring the money is kept safe in case the landlord is entitled to later receive it. *See, e.g.*, *Chernin v. Welchans*, 844 F.2d 322, 326 (6th Cir. 1988) (upholding these types of laws and explaining their rationales).

From there, section 116.21 states that if money in a court's registry[6] goes unclaimed for a sufficient period of time, it will go to the fine and forfeiture fund. In

---

[6] The Amici argue "the court allowed notice that is inconsistent with the SEC's regulations to lost or unresponsive shareholders" but this case has nothing to do with abandoned securities. *See* [AB 2-3]. This case and section 116.21 relate solely to

other words, the application of the statute at issue is to litigants who already know they are involved in disputes and know exactly where any money is and their obligations to claim it. *See infra* Section II.D; *cf. Netzer v. Office of Lawyer Regulation*, 851 F.3d 647, 649 (7th Cir. 2017) (explaining in a bankruptcy proceeding that "[l]itigants have only to check the court's electronic docket once a month in order to protect their interests; this step will ensure that, even if a notice miscarries, a request for additional time can be made . . . ."); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) ("Given the vital purpose that [local] rules serve, litigants ignore them at their peril."); *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 508 (5th Cir.1999) ("[A] party who ignores any case-management deadline does so at his own peril.").

Throughout his brief, Warner describes the necessary period under section 116.21 as being only eighteen months. *See, e.g.*, [PB 4 n.6]. This is incorrect—the period from "prior to January 1 of the preceding year" (*i.e.*, December of year one) to September of year three is a <u>minimum</u> of over twenty-one months.

---

"unclaimed monies deposited" with the clerk in his/her official capacity. *See* § 116.21(1), Fla. Stat.; Fla. Att'y Gen. Op. 99-64, 1999 WL 979659 (1999) ("Section 116.21, Florida Statutes, governs the disposition of all other funds the clerk or the sheriff has collected or deposited in his or her official capacity that remain unclaimed and are not specifically directed to be otherwise disposed of by law."); 1991 Op. Att'y Gen. Fla. 261, 1991 WL 528175 (1991) ("Thus, s. 116.21, F.S., authorizes the clerk of court to remit unclaimed moneys which have been paid to him in his official capacity to the county fine and forfeiture fund.").

Fla. Stat. § 116.21(1). Warner does not specifically identify the calculation points for his supposed "eighteen" months. Regardless, the entire point of this law is that it is applicable only where money was deposited as part of a lawsuit, and that lawsuit ended with the money unclaimed. *See* § 116.21(1), Fla. Stat.

As the Court is aware, lawsuits can span for years. As here, the timeline spanned multiple years: (i) Warner deposited his funds in the eviction case in May 2018, (ii) the court determined the landlord (not Warner) was entitled to the funds at a hearing in October 2018; (iii) Warner purportedly negotiated for the right to receive the funds thereafter, (iv) the court terminated the case due to a long record of inactivity in June 2020, and (v) the funds were forfeited in September 2021. This timeline represents over three years of the Clerk holding the funds, and nearly three years during which Warner could (and should) have tried to claim them if he were so entitled.

Beyond the timeline, Warner never addresses the level of notice due process requires and what the applicable Florida Statutes require here. First, the mere passage of the law itself is a notice to all citizens of Florida that they must comply with it. *Texaco, Inc. v. Short*, 454 U.S. 516, 531–32 (1982) ("Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply."). Second, under section 116.21(2), a clerk of court must pay to have a list of unclaimed funds

17

"published one time … in a newspaper of general circulation" in the relevant county where the dispute occurred, as an *additional* safeguard.

Both Warner and the Amici spend most of their arguments disparaging the specific publication at issue in this case, describing *La Gaceta* as a "non-English periodical" or "a newspaper that is not even for English speakers[.]" [AB 5; PB 21][7] In doing so, they ignore the actual nature of *La Gaceta* as a community newspaper covering stories of interest to the Hillsborough community in which this dispute arose. And they also ignore related Florida law, which requires all legal notices to be published freely online at www.floridapublicnotices.com. § 50.0211(3), Fla. Stat.[8] Warner's question of whether "in the age of telephones, texts, email, and

---

[7] As it is, neither Warner nor the Amici challenge the fact that *La Gaceta* complied with Florida law. *See* [Doc. 37-1, at 3–4, 8–9; *infra* Section II.A]. Florida law permits publication in a newspaper "containing at least 25 percent of its words in the English language" *see* § 50.011(1), Fla. Stat., and there is no dispute *La Gaceta* contains much more than 25% of its words in English. Additionally, neither Warner nor the Amici challenge the fact that *La Gaceta* also complied with section 50.0211, Florida Statutes, which requires online publication at no additional charge and posting to the statewide public repository. Section 50.0211 has been amended several times since 2021, but the pertinent requirements have been the same since at least October 1, 2014—well before the timeline of this action. The 2014 law implementing the central online repository is available at https://laws.flrules.org/2014/210.

[8] As explained above in footnote 7, these contours have changed since 2021, but aspects like the central repository for notices have continued to exist throughout that entire period. *See, e.g.*, [Doc. 37-1, at 4 (noting *La Gaceta's* compliance with the online posting requirement as far back as 2018, back when Warner first deposited the funds into the registry)].

electronic filing, does a statute requiring only publication in a local newspaper" survive constitutional challenge, [PB iii], is a misdirect; the Florida legislature adopted one of the exact types of technological advancements he claims to desire (online publication, *i.e.*, electronic filing). Warner cannot demand this Court prescribe a specific option once the due process floor is satisfied. *See Wash. State Grange*, 552 U.S. at 450-51 (explaining facial challenges are disfavored because, *inter alia*, courts should not formulate a rule broader than what is required). Even the *Flowers* opinion upon which Warner relies, [PB 25], states: "It is not our responsibility to prescribe the form of service that the government should adopt." *Jones v. Flowers*, 547 U.S. 220, 238 (2006) (internal quotation modified in *Flowers*) (citation omitted).

In sum, Warner's facial challenge is meritless, and it invites the Court to issue a sweeping order declaring policy choices by legislatures invalid even where those legislatures attempt to balance changing technologies and methods reasonably designed to reach interested parties. It also asks the Court to undermine the basic premise of the adversarial system that parties (such as those to eviction proceedings) are responsible for managing their own interests. *See Greenlaw v. U.S.*, 554 U.S. 237, 243 (2008) (recognizing foundational principle of the adversarial system is the expectation parties' raise their own arguments); *Castro v. U.S.*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the

premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). And it invites the Court to excuse all parties from any semblance of personal responsibility for maintaining their own affairs. *Infra* Section II.D. The law is constitutional, and Warner's efforts to avoid describing its actual requirements are unpersuasive.

## II.    THE CLERK'S ACTIONS WERE CONSTITUTIONAL AS APPLIED TO WARNER'S SITUATION.

Warner's as-applied challenge to the statute fares no better. At the end of the day, Warner is a citizen of Florida, he is subject to a basic requirement to know and follow the law, and he did not. In sum, the as-applied challenge distills into two straightforward questions: (1) was Florida's law constitutional, and (2) did the Clerk follow it? If the answer to both questions is yes (it is), then Warner's as-applied challenge must fail.

### A.    The Constitution establishes a <u>floor</u> of rights; the legislatures of this country establish its contours. The Clerk fully complied with Florida's specific contours.

Begin with a point from Section I: The Constitution represents a floor of protections; determining the flexible details above that floor is reserved for the people through the political branches of government. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) ("'[D]ue process is flexible,' we have stressed repeatedly, and it 'calls for such procedural protections as the particular situation demands.'"); *Bracy v.*

*Gramly*, 520 U.S. 899, 904 (1997) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."). More to the point, the Supreme Court has explained:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

And as explained in Section I, Florida's Legislature has done exactly that, crafting a law that governs parties in active litigation and requiring them to take affirmative steps to resolve their own disputes over money ownership. Florida law requires clerks of court, after at least (but in practice many more) twenty-one months of retaining funds in the registry, publish one notice in a compliant paper of general circulation. There is no dispute the Clerk complied with Florida law with the publication in *La Gaceta*.

Below, Warner tried arguing in his summary judgment motion that *La Gaceta* did not comply with section 50.011, Florida Statutes. [Doc. 33, at 20] The District Court rejected his argument and found *La Gaceta* complied with the applicable statute, [Doc. 50, at 8–9], just as Florida's Twelfth Judicial Circuit and the Middle District had concluded in earlier cases. *Davis v. Hillsborough Cty.*, Case No. 8:20-cv-0167, 2020 WL 7041762 (M.D. Fla. Dec. 1, 2020); [Doc. 37-1]. Unable to raise

21

any legitimate attack on the Clerk's compliance with Florida's statutes, on appeal Warner shifted entirely to arguing that the statutes are themselves problematic. *See* [PB 18–39 (omitting any argument that the Clerk did not comply with Florida law)]; *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012) (recognizing that an appellant abandons an issue by failing to argue it).[9]

This implicit admission—that the Clerk complied with Florida law—is fatal to Warner's claim. If the Court accepts that Florida's statutory framework is constitutional, as explained above in Section I, then the Clerk's undisputed compliance with that framework is likewise constitutional. To the extent there are any doubts, the following sections of this brief address Warner's numerous failings that led to this situation. At heart, however, the case really is as simple as concluding that the Clerk complied with a constitutional law.

**B.    Warner's efforts to disparage *La Gaceta* are unpersuasive.**

Unable to argue that the Clerk failed to comply with Florida law, Warner and the Amici instead focus their efforts on disparaging *La Gaceta*. *See, e.g.*, [PB iii, 1, 21, 31 (referring to *La Gaceta* with phrases such as "non-English printed periodical"); AB 3, 5 (same)]. Unable to present a legal challenge to *La Gaceta*,

---

[9] In *U.S. v. Durham*, the Court overruled *Hamilton* to the extent that a Supreme Court decision overturns precedent, in which case the parties may address the change in law. 795 F.3d 1329, 1330 (11th Cir. 2015). That decision does not affect the outcome here.

Warner and the Amici attack and disparage a newspaper that has survived more than 100 years by publishing stories relevant to Tampa and the surrounding communities—specifically, a paper that has expanded its offerings to three different languages in an effort to reach multiple audiences *beyond* just English speakers *and* that multiple courts have upheld. [Doc. 50, at 8–9; *see also* Doc. 33-18, at 6:16–8:12, 12:4–14:6, 18:1–14 (describing *La Gaceta's* efforts to reach a broad audience, and the availability of its legal advertisements for free online)]. Contrary to the suggestions by Warner and the Amici, *La Gaceta* is truly a "community" paper that encompasses the diverse culture living in the Tampa Bay area and offers its stories in languages that draw readers from more than a narrow group.

There are a few ways to interpret Warner's descriptions of *La Gaceta*, and none are helpful to his case. The first is a straightforward claim that he personally does not read *La Gaceta* (or check freely available online legal notices . . . or pay attention to his ongoing lawsuits). But whether Warner reads or does not read *La Gaceta* is not the question; the questions are (1) whether Florida's framework is constitutional, and (2) whether the Clerk complied with it by using *La Gaceta*. As discussed above in Sections I and II.A, the answer to both is "yes."

The second way to interpret the argument by Warner and the Amici is as a suggestion that published notices should be in papers that cater only exclusively to English readers, rather than papers like *La Gaceta* that attempt to focus on local

stories of interest that cater to people who speak a variety of languages other than just English. Presumably this argument would even carry to a community with, for example, 50% of the population speaking Spanish or another language. Or perhaps Warner is suggesting that clerks of court should use only big, corporate papers like "CITY NAME TIMES."

But those are not constitutional questions; they are policy questions. *See Bracy v. Gramly*, 520 U.S. 899, 904 (1997) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."). And more to the point, they are policy questions the Florida legislature rejected in favor of a system that promotes both flexibility and transparency. Clerks of court that rely on section 116.21 do not have to box themselves into trying to guess which paper is least likely to result in a constitutional lawsuit,[10] and small, local papers are on even footing with the larger publications with respect to the ability to receive funding through published legal notices. To the extent there are any potential concerns that a certain person might not read a certain paper, those concerns are completely neutralized by section 50.0211, which runs all legal notices in a central, online repository (www.floridapublicnotices.com).

---

[10] Notably, the "25% English" requirement that Warner and the Amici dislike is just a floor required by statute. Here, *La Gaceta* contained much more than 25% of its content in English.

In short, Florida covered all of its bases, and by following Florida law and using *La Gaceta*, an undisputed "newspaper of general circulation," *supra* Section II.A, the Clerk covered its bases. Warner's disparagement of *La Gaceta* is neither helpful nor persuasive, and is merely an effort to distract from the numerous actual failings that occurred in this case—all of which are attributable to him. *Infra* Section II.D.

### C. Nothing in the Constitution supports Warner's arguments about what the Clerk supposedly should have done.

The forfeiture in this case resulted from Warner's own inaction and disregard for his responsibilities as a party defendant to the Eviction Action, as discussed above, and also below in Section II.D. But before reaching those points, it is worth considering a hypothetical situation. Recapping the points made above, Florida's statutory framework in this case broadly consists of five parts:

1. Under § 83.60, Florida Statutes, a tenant defending against an eviction proceeding can raise defenses such as breaches of the warranty of habitability under section 83.51.

2. If a tenant asserts a defense other than a claim the tenant already paid, the tenant must deposit "due" rent into the registry, where it remains until the termination of the proceeding. § 83.60(2), Fla. Stat.

3. If a case ends and no party obtains an order identifying the owner of the funds, the first January 1 following the termination of the case (January 1 of "year two" because the case would have to terminate during the prior calendar year, *i.e.*, "year one") becomes an important date for accounting—it is the year-beginning date that determines the amount of unclaimed funds. § 116.21(1), Fla. Stat.

25

(describing unclaimed funds from "prior to January 1 of the preceding year").

4. Nineteen months must pass,[11] and a clerk of court must publish legal notice of the unclaimed funds during July of "year three." *Id.*

5. In September of "year three," after over twenty-one entire months pass, the funds are forfeited assuming the above steps are all true. *Id.*

Now imagine if section 116.21 did not have a publication requirement—in other words, remove the fourth part from the framework above. In this hypothetical situation, the law would simply require any funds left in the registry at the start of January of year two would be automatically forfeited in September of year three.

That hypothetical setup would be entirely constitutional because the publication of the law itself would provide sufficient notice to comport with the requirements of due process.

Even opinions that Warner tries to rely on in his brief make this point clearly. For example, Warner cites to *Cerajeski v. Zoeller*, 735 F.3d 577 (7th Cir. 2013) repeatedly in footnotes in the context of his takings claim. [PB 34–35 n.13, 37 n.16] But his brief omits this vital quote:

> [A] state's power of escheat is not limited to abandoned property in the common law sense. The state can "condition the permanent retention of [a] property right on the performance of reasonable conditions that indicate a present intention to retain the interest[.] *Texaco, Inc. v.*

---

[11] Again, it is entirely unclear where Warner gets numbers such as "eighteen months." *See, e.g.*, [PB 4 n.6].

*Short*, [454 U.S. 516, 526 (1982).] [A]nd so the fact that "abandoned" in [a] statute does not mean "abandoned" in the common law sense, but instead means abandoned or unclaimed, does not necessarily limit the state's power to escheat the property.

735 F.3d at 582–83.

Again, due process is concerned with notice, and a state's legislature passing a law is itself notice. *Texaco*, 454 U.S. at 531–32 (explaining in most circumstances a legislature need only pass a law, and the citizenry must in turn comply); *infra* Section II.D. The situation here is no different than a statute of limitations, or a court's local ruling requiring a filing by a certain deadline. If a party misses a statute of limitations or a court deadline, that party will lose substantive rights. But that loss of substantive rights does not trigger a due process violation, and no party or court is obligated to inform a different party about even a very short statute of limitations period in the absence of a statutory notice requirement. *See, e.g.*, *Outler v. U.S.*, 485 F.3d 1273, 1282 n.4 (11th Cir. 2007) ("[T]he law does not require a court, sua sponte, to remind a *pro se* litigant that he has only one year to file his claim."); *Dogan v. Roe*, 8 F. App'x 612, 614 (9th Cir. 2001) (holding that a one-year statute of limitations for prisoners seeking habeas corpus did not violate due process).

Considered against that backdrop, all of Warner's suggestions for what the Clerk allegedly should have done are unpersuasive. His arguments range from saying the Clerk should have tried "calling him" (not that telephone is ever a valid

form of service) to even proposing that the Clerk should have sent a letter to his mother's address. [PB 8, 30] The District Court properly disposed of these demands, finding that the Supreme Court has already disposed of arguments that states should engage in "open-ended search[es] for a new address . . . ." [Doc. 50, at 7 (quoting *Jones v. Flowers*, 547 U.S. 226, 235–36 (2006))]

This also eliminates Warner's repeated claim that the Clerk had to take additional steps upon the return of letters it tried to send to him. [PB 8] The Clerk never had to send any letters; doing so was in fact the Clerk going above and beyond any of its statutory or constitutional obligations. *See* § 116.21, Fla. Stat. (requiring only published notice). A finding to the contrary would simply be punishing attempted efforts to go above and beyond, while simultaneously disincentivizing any future efforts by any clerk of court to do more than the bare minimum.

As it is, all the Clerk had to do to comply with its legal obligations and due process (given Warner's presumed knowledge of the law) was publish the notice in a paper of general circulation, which it did. From there, it was up to Warner to exercise even basic diligence with respect to a lawsuit in which he was a defendant and funds for which he had allegedly negotiated. [Doc. 36 ¶¶ 2, 12–14] While Warner attacks the statutory requirement of publishing notice in a newspaper, he fails to address the additional requirement (also satisfied here) for the printed notice to be available online both at the newspaper's website and the statewide repository.

*See* § 50.0211, Fla. Stat. This is a curious omission for an appellant who seeks to frame his attack on publication by reminding the court that this is an "age of telephones, texts, emails, and electronic filing." *See* [PB iii].

And again, if the Clerk had been required to investigate further (it was not), the record in the Eviction Action indicated the court had determined the landlord was the party entitled to the registry funds. So, if further action had been required, then the Clerk would have needed to follow up with only the landlord and not make any further efforts to find Warner.

### D.    This case actually arises from Warner's inexplicable inaction.

The single most important aspect of Warner's case—and the one he seems most determined to avoid—is the fact that his purported loss of the money is ultimately the result of his own inaction over several years.

The case of *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982), discussed further below in the context of Warner's claim under the Takings Clause, is instructive—specifically the part that Warner avoids citing. The Court in *Texaco* examined the constitutionality of a law involving the automatic extinguishment of unused mineral rights. The appellants in *Texaco* attacked the law with two primary arguments: (1) they did not receive adequate notice of their obligations under the extinguishment statute, and (2) the party that received the mineral rights after the extinguishment

never gave separate notice. *Id.* at 531. Quickly disposing of these arguments, the Court explained a fundamental principle of law:

> The first question raised is simply how a legislature must go about advising its citizens of actions that must be taken to avoid a valid rule of law . . . . The answer to this question is no different from that posed for any legislative enactment affecting substantial rights. *Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.*

*Id.* at 531–32 (emphasis added).

This principle dovetails with the general rule—applicable in virtually every (if not every) scenario—that people are expected to know and comply with the law. *See, e.g.*, *McNeil v. U.S.*, 508 U.S. 106, 113 (1993) (explaining it would be a mistake to allow even *pro se* litigants to claim ignorance of procedural rules); *Faretta v. Cal.*, 422 U.S. 806, 834 n.46 (1975) ("The right of self-representation is not . . . a license not to comply with relevant rules of procedural and substantive law."); *Outler v. U.S.*, 485 F.3d 1273, 1282 n.4 (11th Cir. 2007) ("[T]he law does not require a court, sua sponte, to remind a *pro se* litigant that he has only one year to file his claim."); *U.S. v. Hung Thien Ly*, 646 F.3d 1307, 1315 (11th Cir. 2011) ("[I]gnorance is no hidden virtue; a *pro se* defendant must follow the rules of procedure and evidence . . . ."). The alternative is chaos, with people being allowed to claim ignorance and, at best, creating additional mini trials regarding their subjective knowledge of published laws.

These are not artificial concerns—claiming ignorance is exactly Warner's strategy in this case. Rather than accepting or addressing his own numerous failings, he attempts to deflect them by taking approaches like disparaging *La Gaceta*. *Supra* Section II.B. And Warner never addresses the online availability of the published legal notices. Consider Warner's inexplicable inactivity against the basic requirement that Warner know and follow the law:

- One of the laws Warner was required to know was the obligation to file notices of address changes. [Doc. 21, at 3; Doc. 21-2; Doc. 21-3; Doc. 21-4] And Warner demonstrated his knowledge of this requirement when he filed a proper notice of address change the first time he moved during the Eviction Action. [Doc. 36 ¶ 7] Yet inexplicably, Warner never filed a new notice of address change when he moved a second time while the case remained pending. [*Id.* at ¶ 8][12]

- Additionally, Warner should have known (and, under the cases cited above, was deemed to know) the expectations regarding the money he was actively depositing pursuant to Florida's statutory framework.

_____

[12] This failure casts yet another doubt on Warner's arguments that the Clerk should have scoured every possible source for another address. The Clerk has a procedure for finding parties' addresses: parties are responsible for keeping their addresses up-to-date in the case files, given that they are in the best positions to know their actual addresses. [Doc. 21, at 3] And again, there was never any obligation for the Clerk to send even a single letter under either Florida law or the Constitution. *Supra* Section II.C.

31

- Warner was present at the hearing in the Eviction Action where the judge awarded the landlord possession of the funds, and asked the landlord to submit a proposed order claiming it (*i.e.*, the judge spelled out the steps for claiming it in front of Warner). [*Id.* at ¶ 12] Yet Warner never submitted a written order or sought an opinion awarding him the funds. [*Id.* at ¶ 14]

- Warner was a party to the Eviction Action, and like any member of the public, able to see the docket reflecting the court's written notes memorializing its ruling that the landlord was entitled to the registry funds. *See* [Doc. 33-1 (providing the online docket); Doc. 36-3 (showing the landlord's entitlement to the registry funds following the October 2018 hearing)].

- Warner could have monitored the docket to see all other court activity, including the filing of notices and the closure of the Eviction Action.

- Despite Warner's efforts to misrepresent the actual timeline of this case, the money sat dormant from October 2018 (when the court awarded it to the landlord) to September 2021—a span of nearly three years. [*Id.* at ¶¶ 13, 20]

- Warner never explained any purported reason for his inactivity until this appeal, at which point his story now is simply that he "believ[ed] it

would be safe." [PB 8] This simply does not justify or excuse Warner's inaction.

- Warner allegedly cared enough about the money to explicitly negotiate for it as part of the Eviction Action. [Doc. 36 ¶ 13] Yet he expects the Court to accept that he believed the money would be "safe", despite a determination the landlord was entitled to the money if it submitted a proposed order, leaving it in the court registry for multiple years thereafter, and without even notifying the court when he moved his mailing address a second time.

- Also, during the entire thirty-five month period the funds were in the registry following the October 2018 hearing, Warner evidently did not check the case's docket or any online sources that would have hinted that he might want to claim his money (as if he needed a reason). *See, e.g.*, [Doc. 33-18, at 18:1–14 (explaining the notices were freely available online)].

- As Warner is aware, the final substantive action in the Eviction Action on the funds was a verbal order from the judge awarding the funds to the landlord. [Doc. 36 ¶ 12] Warner never filed anything indicating the parties subsequently agreed to anything different. According to the record (the only evidence in the Eviction Action), the landlord was the

33

party entitled to the funds, pending submission of a proposed order from the landlord. There is no evidence or argument to suggest the landlord was unaware of the funds or that the notice to the landlord was insufficient. *See* [Doc. 33-1 (showing the letters to the landlord reflected on the docket); Doc. 36-3 (showing the landlord's entitlement to the funds following the October 2018 hearing)].

- Lastly, Warner is no stranger to litigation as a *pro se* litigant, and even at the time of the Eviction Action he had an ample share of cases through which he could familiarize himself with the general idea that litigants must know and comply with the law. [Doc. 37, at 13; Doc. 37-3, at 3].[13]

In essence, Warner's appeal is an invitation for the Court to issue an advisory opinion regarding the contours of the law—there is no plausible standard under which his lack of diligence should be rewarded. *See generally Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 678–79 (2016) (Roberts, C.J., dissenting) (outlining the principles of the Court's prohibition on issuing advisory opinions); *U.S. Nat'l Bank*

---

[13] In his interrogatory answers, available at [Doc. 37-3], Warner identified seventeen cases in which he was involved in some capacity before the September 2021 forfeiture.

*of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (same).[14]

None of the facts above are helpful to Warner's case, yet he does not address them at all or outright mischaracterizes them (such as claiming only "eighteen" months of inactivity go into Florida's statutory framework). For example, Warner never addresses his failure to follow the obligation to file an updated address, aside from trying to hand-wave it away by saying he maintained an E-Filing Portal account with the State of Florida (not managed by the Clerk). [PB 8] But the uncontested evidence shows the E-Filing Portal is a state system, and the Clerk's office does not oversee that system. [Doc. 37-2] And in any event, mailed (or even e-mailed) notices are not required under section 116.21 and, accordingly, they are not required under the Constitution either given the general legislative act. *Supra* Section II.C.

Ultimately, there was exactly one party that could have avoided the outcome here: Warner himself. He repeatedly failed to take even the most rudimentary steps to protect his alleged interests, and now asks the Court to issue a sweeping order

---

[14] Relatedly, the questions the Amici pose relate specifically to securities, which are not at issue in this case. The Clerk (and apparently the Amici) is unfamiliar with any situation involving a tenant depositing securities into a court registry subject to section 116.21 as part of an eviction proceeding—i.e., the actual law at issue here. *See generally* [AB (describing securities in the abstract)]. To the extent there are any special nuances the securities law context raises, they are addressable in a case actually involving it. Otherwise, it is all a hypothetical advisory opinion based on a set of facts that might or might not ever arise. This is not a case about a shareholder, but rather an active litigant failing to follow the law during his eviction litigation.

involving constitutional law to bail him out of his own poor decision making. He

had his chance; his inexplicable lack of diligence is the end of the matter.

## III. THE TAKINGS CLAUSE DOES NOT APPLY TO THIS CASE, AND WARNER'S TAKINGS ARGUMENTS ARE MERITLESS.

Warner's arguments regarding the Takings Clause likewise miss the mark.

Warner begins by arguing that he had a property interest in the funds and the taking

was not "custodial." [PB 31–33] But the Clerk did not make these arguments at the

District Court level,[15] and they are nothing more than an effort by Warner to distract

from the issue that actually matters: He never experienced a taking. The District

Court correctly found that the Takings Clause does not apply to this situation, and

Warner's inability to overcome those points does not justify his refusal to address

them.

### A. Warner's brief never addresses *Bennis v. Michigan*, a chief case applicable to his purported "takings" claim.

*Bennis v. Michigan*, 516 U.S. 442 (1996) is a foundational case in the Supreme

Court's takings jurisprudence. The District Court relied on *Bennis* in part when

finding Warner had not experienced a taking, [Doc. 50, at 10], yet Warner never

addresses it. *See* [PB vi]. "The government may not be required to compensate an

---

[15] To be clear, there is no good evidence that Warner in fact had a property interest in the funds (as opposed to possibly his landlord upon submission of a proposed order). Below, the Clerk did not contest Warner's assertion that he negotiated this unwritten deal, merely to avoid the time and cost of litigating the issue, which was not dispositive because no taking ever occurred.

owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis*, 516 U.S. at 452.

The law is also clear that an owner's inaction can forfeit property interests: "The requirement that an owner of a property interest . . . must come forward and file a current statement of claim is not itself a 'taking.'"[16] These foundational principles are fatal to Warner's appeal.

*Bennis* involved a car that the petitioner and her husband jointly owned. 516 U.S. at 443. The husband allegedly engaged in sexual acts with a prostitute in the car, and the state seized the car because it was used in the commission of a crime. *Id.* at 444. Reasonable minds can differ on the policy implications of Michigan's seizure framework and its application to innocent spouses. But reasonable minds cannot differ that the Supreme Court allowed the seizure in *Bennis*, and explicitly held that the wife never experienced a "taking" in a constitutional sense:

> Petitioner also claims that the forfeiture in this case was a taking of private property for public use in violation of the Takings Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment. <u>But if the forfeiture proceeding here in question did not violate the Fourteenth Amendment's [due process provisions], the property in the automobile was transferred by virtue of that proceeding from petitioner to the state.</u> The government

---

[16] *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982) ("It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation.").

> may not be required to compensate an owner for property <u>which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain</u>.

*Id.* at 452 (emphasis added).

The Fifth Amendment to the U.S. Constitution includes the language: "nor shall private property be taken for public use, without just compensation." U.S. Const., Amend V. And since the earliest days of jurisprudence interpreting that language, the Supreme Court has emphasized that it refers to eminent domain specifically. *See, e.g.*, *Kohl v. U.S.*, 91 U.S. 367, 372 (1875); *see also U.S. ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 280 (1943) ("The law of eminent domain is fashioned out of the conflict between people's interest in public projects and the principle of indemnity to the landowner.").

That is why the *Bennis* court was careful to note that the real question in these types of cases is whether the proceedings that led to the supposed "taking" complied with due process. 516 U.S. at 452 ("[I]f the forfeiture proceeding here in question did not violate the Fourteenth Amendment . . . ."); *accord Texaco*, 454 U.S. at 530 ("The requirement that an owner of a property interest . . . must come forward and file a current statement of claim is not itself a 'taking,'"). The state seizing a car because of its use in a crime is not a taking; the state seizing a car because the local police force needs a new one is a taking.

Attempting to shoehorn a takings claim into these types of situations is uncomfortable, because it does not fit. At least Warner's due process claims pose a question that applies to the situation: Did Warner have adequate notice and a fair opportunity to claim the funds? *Supra* Sections I, II (explaining he did). But trying to stretch the law of takings beyond eminent domain as Warner tries to do leads to a lack of clarity in the law, rather than a refining of it. Warner's brief implies that the takings clause applies every time the government acquires possession of property formerly belonging to an individual, and it is exceptions (such as abandonment) that matter. But that is exactly backwards; it is Warner's obligation to prove this matter actually involved eminent domain, rather than a use of a power other than it. *Bennis*, 516 U.S. at 452 (explaining the Takings Clause does not apply except in cases "of eminent domain"). His failure to do so warrants rejection of his arguments.

**B.    Warner's efforts to distinguish the *Texaco* case are unpersuasive.**

Warner's efforts to distinguish *Texaco's* holdings from this case are meritless. Warner offers two suggestions for why the situation here is different than the one in *Texaco*. First, he suggests that Florida's time periods under section 116.21 "are far afield from the 20-year time period at issue in *Texaco*." [PB 36–37] Second, he claims the Florida law is arbitrary because of the inclusion of "at their discretion." [*Id.* at 38]

Warner believes these purported distinctions are relevant. They are not. Nothing in *Texaco* or any other case Warner cites implies any obligation to rule in his favor, which would disrupt Florida's entire statutory framework for notice and parties' obligations to participate in the lawsuits in which they are involved. To the contrary, *Texaco* requires affirmance of the District Court's order.

First and most critically: Warner never actually addresses the reason the District Court cited *Texaco* (just as he never addresses *Bennis*). The District Court's opinion quoted this portion:

> In ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, this Court has never required the State to compensate the owner for the consequences of his own neglect . . . . It is the owner's failure to make any use of the property—and not the action of the state—that causes the lapse of the property right; there is no "taking that requires compensation. <u>The requirement that an owner of a property interest . . . must come forward and file a current statement of claim is not itself a "taking."</u>

[Doc. 50, at 10 (emphasis added) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 530 (1982))] Warner did not submit an order, file a change of address form, respond to notice on the docket, or respond to the published notice.

Again, this is a case about a litigant's inexplicable inaction and the obligation to know the law. States do not have any affirmative obligation to bail people out of their own neglect, *id.*, such as inexplicably leaving cash with the court for nearly

three years while simultaneously failing to keep the court apprised of a current address. *Supra* Section II.D. And Warner's obligation to file a simple proposed order fits perfectly into the *Texaco's* statement that a party who fails to file a statement of claim does not experience a taking. 454 U.S. at 530 ("The requirement that an owner of a property interest . . . must come forward and file a current statement of claim is not itself a 'taking.'").

Turning then to Warner's efforts to distinguish *Texaco*, his first argument, attempting to nitpick the statutory twenty-year period at issue in *Texaco* from the comparatively shorter one in Florida ignores the realities of the two statutes. *See* [PB 36–37]. *Texaco* involved forfeitures of mineral rights to real property where no litigation might exist, whereas the statute here involves funds deposited with the Clerk where a party to active litigation him- or herself deposits the funds and knows their whereabouts (and the law applicable to them). *See Texaco*, 454 U.S. at 531–32 (explaining that the citizenry is presumed to know the law); *cf. Dominguez v. U.S. Atty. Gen.*, 284 F.3d 1258, 1260 (11th Cir. 2002) (quoting *U.S. v. Estrada-Trochez*, 66 F.3d 733, 736 (5th Cir. 1995)) ("[U]ltimate fault lies with the Appellant for [her] failure to comply with a [change of address notification] law that is essential to the administration of the INS.").

There was absolutely no reason for Warner to treat the Clerk as a de facto bank,[17] much less when he could have invested that money in the market or otherwise put it to more productive use than languishing in a court registry. The purpose of the Florida law is simple. Under section 83.60, Florida Statutes, tenants may defend against eviction actions (such as Warner did) by asserting noncompliance of some type by the landlord, such as failing to provide a habitable dwelling. But in allowing these defenses, Florida also recognizes that landlords have an interest in receiving their rental payments, and tenants might use court cases to simply delay rent they in fact owe.

So Florida struck the same balance that numerous other constitutionally valid laws across the country take—tenants must deposit rent into the court's registry pending resolution of the claims, and then the party ultimately entitled to the rent must request it. *Compare* § 83.60, Fla. Stat. (allowing a tenant to raise defenses in a possession action, and requiring deposits of rent during the case's pendency), *with Sylvia Landfield Tr. V. City of Los Angeles*, 729 F.3d 1189, 1193 (9th Cir. 2013) (explaining the rationales behind these types of laws, and upholding them as constitutional despite landlords' objections), *and Chernin v. Welchans*, 844 F.2d 322, 326 (6th Cir. 1988) (same).

---

[17] Even if Warner could treat the Clerk as a bank that never needs to provide monthly account statements, any reasonable person still would have provided their bank with notice of a change of address if they moved—which Warner failed to do here.

The point, however, is that every situation like Warner's Eviction Action where deposits go into the registry under section 83.60 will involve an active lawsuit: A possession action by a landlord. In other words, the statutory law Warner seeks to strike down here will always involve a lawsuit where two parties are legitimately before the court (as a tenant in this situation will be a served defendant and affirmatively make the payments) with full, active knowledge of the case's ongoing nature and the need to participate. This type of situation is quite unlike the *Texaco* scenario, in which a party might acquire mineral rights but have numerous valid reasons for delaying the use of those rights (acquisition of equipment, ongoing projects at other locations, etc.).

This case is about Warner's inaction in a lawsuit where he was the primary defendant. The attempt to compare it to abandoned securities or other situations outside of the litigation context simply go too far and are inapposite. Indeed, securing the speedy resolution of litigation—including lingering questions of money entitlement—is a goal that all courts strive to accomplish. *See, e.g.*, Fed. R. Civ. P. 1 (establishing the "speedy . . . determination of every action and proceeding" as a goal of courts); Fla. R. Civ. P. 1.010 (same). In any event, *Texaco* never stood for the proposition that twenty-years is a hard-and-fast rule, and no authority suggests that Florida's approach to active litigants (i.e., people that should probably pay attention to the rules) is inappropriate.

43

Warner's second argument with respect to *Texaco* is to claim that Florida's law improperly builds an arbitrary standard into itself with the language "[t]he sheriffs and clerks . . . are authorized at their discretion . . . to pay into the fine and forfeiture fund . . . ." § 116.21(1), Fla. Stat.; [PB 38] But that argument ignores that section 116.21's purpose is to establish a <u>floor</u> for the amount of time that a clerk of court must wait to claim funds as forfeited. Warner asks the court to interpret the statute in a way that supposedly makes it unconstitutional, despite the perfectly plausible interpretation that the "at their discretion" language exists merely to note that clerks and sheriffs do not violate the law if they inadvertently fail to forfeit funds, or if they decide to be extra generous above the floor. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)) ("[I]t is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *see also supra* Sections I and II (outlining how the timeline floor is constitutionally acceptable for due process considerations). And in any event, there was never any argument at the lower court level that the Clerk (or any clerk for that matter) was acting arbitrarily in its assessment of section 116.21.

Finally, it is worth reiterating that this case is about the inaction of a defendant within litigation. *Supra* Section II.D. It cannot be overemphasized that <u>Warner was a litigant in an active lawsuit</u>. The burden to know and follow the law was ultimately

44

on him, yet he did not take any steps to protect any rights he might have to the registry funds, even when the case was dismissed for inactivity. The Court does not need to upend a constitutionally sound framework simply to bail Warner out of his own inattentiveness, particularly where no actual "taking" occurred. *Supra* Section III.A.

## CONCLUSION

At the end of the day, this is a case about a litigant that intentionally left money in a court registry for almost three years—from October 2018, to September 2021. [PB 8 ("Warner left his money [for nearly three years] in the court registry, believing it would be safe.")] Florida law (along with the law of presumably every other jurisdiction, including the federal courts) requires Warner know about the law. When a litigant such as Warner fails to inform himself or otherwise seek help of counsel, then that litigant cannot claim to have suffered any deprivation other than a self-inflicted one.

Warner chose to ignore the funds and his Eviction Action at his peril. It was unreasonable behavior that does not warrant reversing the well-reasoned opinion of the Court below or rewriting the Constitution so that it forms a series of granular rules about the specific types of technology states should use for notices. Section 116.21 provides a constitutionally valid process for the Clerk to follow, and the Clerk did its job in following that process. And that process does not result in a

constitutional "taking." Warner had ample opportunity to claim the funds if they were in fact his; the Court should not reward his lack of diligence.

Respectfully submitted,

/s/ Kristen M. Fiore
KRISTEN M. FIORE, B.C.S. (25766)
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

JASON L. MARGOLIN (69881)
**AKERMAN LLP**
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone:  (813) 209-5009
Facsimile:   (813) 223-2837
jason.margolin@akerman.com

**ATTORNEYS FOR APPELLEE**

76666615;12

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 11,216 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii). This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, B.C.S.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 24th, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will automatically send a copy to all counsel of record in this case registered on the CM/ECF system.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, B.C.S.

76666615;12